

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,375

**JOHN THUESEN, Appellant**

**v.**

**THE STATE OF TEXAS**

**ON DIRECT APPEAL FROM CAUSE NO. 09-02136-CRF-272
IN THE 272ND DISTRICT COURT
BRAZOS COUNTY**

**PRICE, J., delivered the opinion of a unanimous Court.**

## O P I N I O N

Appellant was convicted in May 2010 of capital murder committed in March 2009.[1]

Based on the jury's answers to the special issues set forth in Texas Code of Criminal

---

[1] TEX. PENAL CODE ANN. § 19.03(a)(7).

Procedure Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death.[2]

Direct appeal to this Court is automatic.[3]  After reviewing appellant's forty-five points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

Appellant was convicted of murdering his girlfriend, Rachel Joiner, and her brother, Travis Joiner, during the same criminal transaction on March 6, 2009.  The evidence showed that appellant began dating Rachel, a fellow college student, in October 2008.  Before they met, appellant had been in the Marine Corps for six years, and he had served in Iraq for several months in 2004 and 2005.

Appellant introduced evidence of his military experiences and his mental state at both phases of the trial.  He presented such evidence at the guilt phase to show that he did not have the requisite *mens rea* to intentionally or knowingly kill the victims, and at the punishment phase to rebut the State's evidence of future dangerousness and provide mitigating evidence.

At the guilt phase, Officer Micah Lunt, a "mental health peace officer" who had been trained to deal with people in mental health crisis, testified that on August 29, 2008, he went to appellant's house in response to a call from the Veterans Administration ("VA") Suicide

---

[2]  Art. 37.071, § 2(g).  Unless otherwise indicated all references to Articles refer to the Code of Criminal Procedure.

[3]  Art. 37.071, § 2(h).

Hotline. As Lunt reached appellant's house, he maintained contact with a VA counselor who was talking to appellant by telephone. Lunt waited behind a large tree in front of appellant's house while the counselor instructed appellant to walk outside unarmed, and after watching appellant comply with these instructions, Lunt approached appellant. After talking to and observing appellant, Lunt determined that appellant was in crisis. Appellant voluntarily accompanied Lunt to the College Station Medical Center. Because of appellant's depressed state, it was hard to get him to answer questions. Appellant had a very flat, deflated affect. Lunt helped arrange for appellant's transport from the Medical Center to the Michael DeBakey Hospital (the "VA hospital") in Houston. Lunt acknowledged that appellant was not afraid of law-enforcement officials or weapons and that he had been able to call for help in a crisis.

Dr. Ismael Carlo, a psychiatrist working with the VA hospital, testified about his diagnosis and treatment of appellant from appellant's arrival on Friday evening, August 29, 2008, until his discharge the following Tuesday morning. Carlo noted post-traumatic stress disorder ("PTSD") symptoms and diagnosed appellant with major depressive disorder, a chronic condition requiring lifelong treatment. Appellant was discharged from the VA hospital with the understanding that he would take his gun to his parents' house for safekeeping, continue to take his prescribed anti-depressant medication, and participate in outpatient treatment in College Station.

Teresa Cannon, appellant's VA counselor in College Station, testified that, after appellant began dating Rachel, he seemed less depressed, although his PTSD symptoms

remained the same. At appellant's request, they had reduced the frequency of their counseling sessions, and against Cannon's advice, appellant had stopped taking his anti-depressant medications. When Cannon last met with appellant in March 2009, he seemed tired and irritable. He complained about a number of stressors, including worries about his relationship with Rachel, but Cannon was not concerned about his stability or safety. On cross-examination, Cannon acknowledged that most veterans she treated with PTSD exhibited hypervigilance, intrusive thoughts, anger, rage, and anxiety, but appellant was the only one of her patients who had murdered someone.

Marine Corps Sergeant Jerry Abbot testified that appellant was a machine gunner in his platoon in Iraq. Abbot chose appellant to ride in his vehicle when they patrolled because he trusted appellant and appellant was very good at his job. Abbot described their duties and activities while in Iraq and testified that they were under fire several times. On one occasion when they were approaching a supposedly safe location, two rocket-propelled grenades exploded about ten to fifteen feet from their vehicle. Often the people who shot at them would hide in a crowd, so they could not respond. Sometimes they were called upon to raid houses at night.

Marine Corps Sergeant Romero Garcia supervised appellant's platoon in Iraq in 2004. He testified that appellant was a machine gunner and that their platoon's mission was to drive through populated areas and draw fire so that they could locate and defeat armed adversaries. They also set up vehicle checkpoints where they sometimes had to "take out" vehicles that did not stop to be searched. Appellant was one of the people who would be ordered to take

them out. Sometimes women and children would be in those vehicles. Garcia acknowledged that, from their experience in Iraq, appellant had personal knowledge of what a bullet does to a human being. Garcia, who suffered from PTSD upon returning to the United States, believed that appellant also had PTSD. In the four months before the offense, Garcia received two or three late-night calls from appellant in which he could tell that appellant was "pretty drunk." He did not know whether appellant ever sought treatment for PTSD or any other details of how appellant coped with his problems.

David Ottmer, a friend of appellant's family who was also a veteran, testified that, when appellant returned from Iraq in 2005, he had a look in his eyes like he was disconnected from reality. Ottmer recognized this look as one that he had seen in other veterans and in himself.

Appellant's mother, Patricia Thuesen,[4] testified she did not notice any changes in appellant when he first returned from Iraq in March 2005, but she began to notice a difference in him about six or eight months after he got home. Sometimes when appellant had been drinking, he would cry and tell her he "didn't mean to do it, but . . . [he] had to save [his] brothers." They were not a family that talked easily about problems and feelings, and she told appellant that he should talk to his Marine buddies. He kept his room perfectly organized, and he noticed if anything was out of place. He startled so easily that he would grab for her if she tapped him on the shoulder, and he would "take a swing" when she went

_____

[4] We shall refer to Patricia Thuesen by her first name to distinguish her from other members of the Thuesen family.

into his room to wake him up in the morning. She picked him up from the VA hospital in September 2008, but she did not know the details of why he was there until she heard Dr. Carlo's testimony. Appellant seemed to improve after he left the VA hospital and was taking the medications he had been prescribed. She did not know where appellant kept his gun, and she had never talked with him about moving it for safekeeping.

She testified that appellant was never aggressive toward her, and as a boy he was taught not to hit girls. She met Rachel, and she never saw them argue; they were affectionate with each other. Appellant sounded fine when they talked by telephone in the week before the offense. She was shocked when he called her on March 6 and told her that he shot Rachel. When she saw him in jail on March 7, he was "drawn in" and disoriented; he did not look like himself. Patricia testified that her son as she knew him could not have intentionally or knowingly killed Rachel and Travis.

Patricia nevertheless acknowledged that a young woman had obtained a protective order against appellant in 2007. A redacted version of the protective order was admitted as State's Exhibit 206. Patricia testified that she was not aware that the order prohibited appellant from having a gun for two years.

An audio recording of the 9-1-1 call that appellant placed immediately after shooting Rachel and Travis in their College Station residence was published to the jury. Appellant was breathing hard and fast as he gave the dispatcher the address and told him that there were two gunshot victims. When the dispatcher asked him what happened, appellant stated, "I got mad at my girlfriend and I shot her." He told the dispatcher that she had a "sucking chest

wound." She was "just breathing" and moaning, and she could not say anything. The dispatcher placed a paramedic on the line to talk to appellant. Appellant stated that he did not think that she was "going to make it." Following the paramedic's instructions, appellant checked Rachel's airway. He stated that Rachel was trying to say something but she could not get it out. He could hear the air moving in and out of her chest. Appellant informed the paramedic that her brother "surprised" him and appellant "shot him, too." Again following the paramedic's instructions, he went to check on Travis. Appellant reported that he thought Travis was dead because he was not breathing, was nonresponsive, and did not have a pulse. The dispatcher then asked appellant to step outside, and appellant stated that he was unloading his gun. Rachel could be heard moaning in the background. At that point, the recording ended.

Officer Tom Jagielski arrested and *Mirandized* appellant after he walked out of the victims' garage. He waited with appellant in the victims' front yard as emergency responders transported the victims. Jagielski, a "mental health peace officer," testified that appellant was cooperative and seemed remorseful and concerned about the victims' conditions. Jagielski did not believe that appellant was in a mental health crisis or experiencing delusions at that time.

In a recorded conversation between appellant and Jagielski that began while they were waiting in the victims' front yard, Jagielski verified that appellant had not been shot and that appellant's only weapon was in the garage. Although appellant initially did not want to talk about what happened, he eventually asked if he could be the one to break the news to his own

parents, and Jagielski responded that he would work that out. Appellant then asked if Travis was going to make it, and Jagielski told him that Travis was still alive and there was always a possibility. Jagielski asked appellant where he shot Travis, and appellant stated that he shot him in the mid-section.

Jagielski introduced appellant to Detective Katy Reiter, saying that she would talk to someone about letting appellant call his parents. Appellant told Reiter that he and Rachel had been in bad shape for a couple of weeks because Rachel had said she needed space. Reiter asked him if he had taken any medications or had anything to drink, and appellant responded that he had been drinking on the previous night. He stated that he usually carried his gun in his car and that he had been in the Marine Corps for six years. He described the gun as a .45 caliber, 911 model. He stated that he and Rachel had been together for six months, but the previous weekend she had wanted to "back off pretty hard." Reiter then left appellant and Jagielski.

Jagielski told appellant that Rachel would probably be all right. Appellant stated that recently, Rachel had been angry with him "all the time." Jagielski introduced appellant to Detective Kirk Webb and told appellant that Webb wanted to talk to him at the police station. Jagielski then transported appellant to the station. During transport, appellant asked Jagielski how the victims were, and Jagielski said he did not know anything yet. He stated that he thought "[Rachel] looked like she was in pretty good shape," but appellant disagreed, noting that she had gone pale.

The audio recording continued at the station, where Jagielski took appellant to a

holding cell. He advised appellant that the victims would go into surgery and that he would inform appellant as soon as he heard any news. Appellant expressed regret for what had happened and concern about Rachel's condition. He told Jagielski that he shot the victims with hollow-point .45 caliber bullets, and he commented on the amount of blood at the scene. Jagielski asked appellant whether he first shot Rachel from the back or the front, and appellant stated that he shot her from the back. Appellant explained that Rachel's brother heard the first shot and went to get a gun, so appellant shot him, and then he shot Rachel again. Jagielski thereafter introduced appellant to Detective Patrick Massey and ended his recorded conversation with appellant.

In a videotaped interview with Detectives Massey and Webb, appellant explained that he had served in the Marine Corps and had spent seven or eight months in Iraq. He said that he used an M16 and a machine gun, and his platoon helped with weapons control on roads and in cities in Iraq. Massey asked him if he saw "much action," and appellant responded that he saw "a little here and there."

Appellant stated that he always wanted to attend college, but he "failed out" of high school because of too much partying and so he could not go to college right away. After his time in Iraq, he did well in school and was more focused. He moved to College Station to attend college and become a mechanical engineer. He had worked for BMI Combat Systems since August 2008.

Appellant said that he met Rachel, a fellow college student, in September 2008, and they began dating in October. The first few months of their relationship were good. They

argued occasionally but tried to avoid hurting each other. Appellant did not really have any other friends in College Station; he just spent time with Rachel.

Webb asked appellant whether he had ever had thoughts of harming himself before this incident. Appellant nodded. Massey asked him if he had ever acted on those thoughts. Appellant answered that he "almost" harmed himself in August 2008 because he was "down about a lot of things." He went to the VA hospital for about four days for treatment for alcohol abuse and depression and then to a VA outpatient clinic in College Station for counseling. Recently, he had been seeing his VA counselor less frequently. He last saw her on the Wednesday before the offense. They talked about appellant's stressors, including problems in his relationship with Rachel, balancing the responsibilities of school and work, and needing more financial aid.

Massey asked appellant if Rachel wanted to break up with him. Appellant answered, "I couldn't tell." He stated that some of his friends were telling him to give her space, while others were telling him to move on because it was over. Rachel kept telling him she wanted space, and she was ignoring his calls and texts "a lot." He asked her if he could just see her one night, but he did not see her or stay the night with her "the whole week" before the offense. He saw her "maybe for an hour this whole week."

Webb asked appellant what he and Rachel had argued about. Appellant stated that the previous weekend was when Rachel said she needed space. Appellant wanted to keep seeing her once or twice a week, but she said she could not do that because she had too much going on. She had just started a new job. She did not want to schedule any time for him,

saying that she did not know when she would feel like seeing him again.

In the past, when Rachel would go out with other friends, she would stay with appellant at his house afterward. He did not understand why that had changed. Rachel said she needed space because she was too busy and stressed, but appellant was also busy and stressed. Appellant kept getting angrier and angrier. He did not understand why Rachel went from seeing him every day to not even letting him stay with her one night. He just wanted to ease the sudden separation.

Rachel "got really pissed at" him, telling him that she did not want to see him and that he was "not respecting [her] space." She told him that he was always bugging her. She let him know that her ex-boyfriend was helping her with calculus and that appellant could not help her because he tended to get too mad and frustrated with her. She told him that she felt uncomfortable talking to him "about anything at all anymore."

The night before the offense, appellant went to see Rachel for help with a calculus problem, but she was out with her ex-boyfriend. Webb asked appellant if he knew in advance that Rachel was going out that night. Appellant stated that he did not. He tried to call her in the afternoon as he was leaving his job, but she did not answer her phone. When he later went to her house, she was napping. Appellant suggested that he could come back later, and she told him not to expect her to be in a good mood. Appellant then went home.

After appellant got home, he called his friend, Janet Walker, who told him that it sounded like the relationship was over and that he needed to move on. Walker told him not to go back to Rachel's house or call Rachel any more. Massey asked appellant if he ever

talked to anyone about shooting Rachel. Appellant stated that he probably said something like that to Walker, but it was not anything he thought he would really do.

Around 9:30 p.m., appellant returned to Rachel's house for help on a calculus problem. She was not at home, so he called her. She told him that she was not going to wait on him "like a slave" or go home just because he wanted her to and that she was going out with her ex-boyfriend.

Appellant then went to the home of Johnny Matthys, who was Rachel's ex-boyfriend. He "hopped a fence" to talk to Rachel, who was standing on the front porch. When she saw appellant, she told him that he needed to leave, and that he was lucky they did not call the cops. She told him that if he crept up on her again he might find her "fucking the next guy," which he took to mean that if he did not stop acting that way she would break up with him. He told her he was sorry and left. Later, Rachel texted him and said that he was "lucky [he] didn't get [his] ass shot." Appellant texted back and said again that he was sorry and that he would not do it again.

After that, appellant went home. He drank beer and called another friend, Gunnery Sergeant Brian Keith, around 10:30 or 11:00 p.m. Keith told him to give Rachel the space she wanted. Appellant, however, went to Rachel's house at 2:00 a.m. "because that's usually when the clubs close." He parked down the street and waited in his car for a short time. He had a loaded 911 semiautomatic that he had purchased from Carter's Country in Houston in May 2006 or 2007. He knew the garage-door code and used it to enter Rachel's house. He admitted that he once entered her house without her knowledge on a previous occasion and

found Matthys there.

Massey asked appellant if he had scenarios in mind before Rachel arrived home. Appellant responded that he did not know what he wanted to do. Massey suggested that one scenario was turning the gun on himself, another scenario was talking to Rachel, and a third scenario was what actually happened. Appellant acknowledged these suggestions with a nod. However, he later stated that he did not know why he was there or how it would go. He said, "It just got out of hand."

Upon further discussion, appellant said he thought he might catch Rachel and Matthys together and "beat him up or scare the shit out of him." While he was waiting at Rachel's house, they exchanged texts, and he falsely informed her that he had gone out with his friends. He asked her if she would call him later, and she said that she would not. He said, "I was confused. I didn't want to hurt her. I didn't want to do it, but I did."

Appellant stated that his gun was on the carpet next to him while he was lying in Rachel's bed and waiting for her to come home. He drank a beer around 4:00 a.m. Travis got home around 4:00 a.m, and from the upstairs window appellant saw him walking from his car to the front door. It sounded like Travis went straight to bed.

Rachel did not get home until the afternoon around 12:45 or 12:50 p.m. Just before Rachel walked into her bedroom, appellant heard her coming upstairs and moved into another room so that she would not see him. As she entered her room, he walked in behind her with his gun at his side. He lifted it up and told her it was loaded. Rachel said, "Really? A fucking loaded handgun? You're pointing a loaded gun at me? Why do you have a loaded

gun at my house?" She wanted to go get her brother, but appellant stopped her and pushed her down onto her couch. She wrestled with him, but he told her, "You need to answer me some questions," and "We need to talk." Appellant held her down because she wanted to run and he wanted to talk. Rachel tried to call Matthys, but appellant grabbed her cell phone and hung it up. Appellant texted Matthys, "Don't worry about it." Matthys texted back: "About what?" Appellant texted him, "NM," a shorthand notation that Rachel sometimes used for "never mind."

Rachel told appellant that he was crazy, saying, "I didn't think much about your ex-girlfriend before . . . . I don't think she's crazy, I think you're crazy." He was getting angry and kept asking her why it had "to be this way." They argued for about ten minutes. At one point, Rachel told him that all she wanted was space, she was not cheating on him, she did not want to break up with him, and she had stayed at her ex-boyfriend's house because she did not want to drive home drunk.

Rachel told appellant that if he would leave, she would not call the police. Instead of leaving, however, appellant turned his gun on himself. He told Rachel that he could not be with her any more and there was probably no going back after what had happened. Massey asked appellant why he turned the gun on himself. Appellant stated, "I just wanted to end it because I was hurting and I didn't want to hurt her." Rachel asked appellant for the gun, so he uncocked it and handed it to her. She told him that he needed to leave and that she would give him the gun once he was outside. She walked appellant down the stairs, saying that Matthys was probably waiting for her outside. Appellant stopped Rachel by the front

door and grabbed for his gun, but she resisted. Appellant explained that he had been about to leave before he grabbed the gun, but then he changed his mind, telling himself, "I can't leave right now, we just need to clear it up right now. Let's clear this up and talk about it." They struggled over the gun until appellant got it from her. Rachel then tried to leave through the front door, but appellant would not let her. He told her that he just wanted to be with her, and he did not "want it to come to that," but she pushed him and kneed him in the crotch and ran through the house toward the garage, still trying to go outside.

The garage door had been closed, but Rachel ran to the interior doorway and pushed the garage door button to open it. She was headed toward the opening garage door when appellant reached the interior doorway and pushed the button to make the door to go back down. Appellant stated that he closed the garage door "to try and stop her," but Rachel did not stop. She was facing away from appellant, trying to crawl under the closing garage door, but then she stood up and he "popped her." Appellant stated that he wanted to keep her from leaving and he "didn't want her to make a spectacle."

After the first shot, Rachel was "really hurting," and there was blood spatter everywhere inside. She turned to go back inside and ran toward the kitchen. Appellant followed her inside, and "that's when her brother surprised [him]." Appellant feared that Travis had a gun because Rachel had told appellant that her brother had a gun while she was telling him to leave. Appellant said, "Everything just happened so fast and I just reacted." Travis ran out from his bedroom and met Rachel in the kitchen area. He was standing on the other side of a separator between the kitchen and the hall. He looked at appellant, and

appellant fired over the separator. Appellant shot Travis in his "center mass," and when Travis turned and moved toward the stairs, appellant shot him in the lower right hip. Massey asked appellant if Travis had a gun, and appellant responded that he did not see a gun. Appellant could not see Travis's hands; he only saw his face.

Rachel ran past appellant while he was shooting Travis. After the second shot to Travis, appellant immediately turned back to Rachel. He shot Rachel a second time, and when she turned to go back into the garage, appellant shot her a third time. Rachel turned around, looked at him, "went blank," and fell over. "She couldn't say anything for the longest while it seemed," and then she just started moaning.

Appellant explained that he sat on the garage floor and propped Rachel up between his legs while he held her and tried to close the front chest wound and a wound on her back. He felt a bullet in her sternum and heard a gurgling sound like a "sucking chest wound." He applied pressure to her chest using plastic, as he had been instructed in the military, and he checked her airway as instructed by the 9-1-1 dispatcher. Travis was not moving when appellant ran inside to check on him.

When Massey asked appellant what he was thinking after the first shot, he answered that he thought somebody was going to bring out a gun and shoot him. He felt jealousy and anger and "was mad . . . about things." He felt like Rachel was going to leave him anyway. Webb asked appellant whether he felt better after the first shot. Appellant responded, "Not at all. I didn't feel good, I didn't want to do it . . . I don't know why. I guess all those feelings together made me want to do it."

When asked why he continued after the first shot, appellant could not answer or explain. "I felt like I was in like a mode . . . like training or a game or something. Felt the need to be quick . . . ." Massey observed that it seemed like appellant wanted containment, to keep the situation from getting outside. Appellant agreed, but added, "After I had come to, like, out of whatever it was, like, all that – stuff, uh, I'd seen what I'd done, when I looked at her and she fell, uh, I felt horrible and I just, ah, wish I'd never done it." Appellant stated that he still felt horrible and that if he had just gone to talk to Rachel without the pistol, maybe this would not have happened. He never intended to hurt her, and he did not know why he did it. Massey asked if one reason was jealousy. Appellant responded, "Probably."

When asked how he felt about Travis, appellant stated that he wished he had never harmed him because Travis never did anything to him. "I just thought he was going to . . . hurt me, too, and it was just a fast reaction . . . just got out of hand." Appellant later stated that he thought that he shot Travis because he was surprised and felt threatened that Travis would call the police or bring a gun or stop him from talking to Rachel. Appellant stated that he did not want Travis to get his gun, so he shot him low just to try to stop him. Massey pointed out that by the time appellant shot him in the hip, Travis was moving toward the front door, trying to leave. His room was behind him, so he was not going to get a gun. Appellant responded, "I guess you're right."

When asked whether he knew what he did was wrong, appellant stated, "Yeah, it came to me after," while he was helping Rachel. He wished he could have taken it back. Appellant stated that he regretted every bit of it and that he did not want Rachel to die.

Massey asked appellant if he had a girlfriend before Rachel, and appellant stated that his last "real" girlfriend, Leah Mathis,[5] was "the one I got in trouble with before." Appellant explained that he went out with Leah for almost three years. When their relationship ended around July or August 2007, Leah accused him of stalking because he went to her house one night when he had too much to drink and started knocking on her window to ask her to reconsider whether they could still have a relationship. He also accessed Leah's MySpace account and discovered that she had been going out with other people. Additionally, he kept trying to call her and ask her why she would not talk to him, and he would go to places she frequented to try to talk to her. Appellant explained that after he showed up at her house, he was first given warnings for trespass and public intoxication, but the police left his car parked outside Leah's house when they arrested him. After they released him, he went back to get his car. While he was there, he knocked on the door of the house to talk to Leah's father. Based on that incident, as well as appellant's other activities, "they decided to proceed with a protective order."

Appellant acknowledged buying his gun around the same time that he and Leah broke up. However, he explained that he and his brother bought their guns together to practice shooting at their family farm. Appellant explained that he bought the gun before he and Leah broke up, and he never took his gun to her house. When asked if he ever had any thoughts that were similar to what he was thinking during this incident, appellant responded, "Yeah,

---

[5] Because of the similarity between Johnny Matthys's and Leah Mathis's names, we will refer to Leah Mathis as "Leah."

that I was tired of being walked on or lied to or something, or, you know. . . ." He further stated, "I didn't want the bullshit and I just couldn't understand . . . why you can't see me if you don't want to break up with me . . . . [B]ut you want to be with me, how come you can't see me but you go to see someone else."

Massey testified at trial that he did not see signs of mental illness while talking to appellant. Appellant was upset at the beginning of the interview, but he did not seem generally depressed or nervous, and he displayed no signs of intoxication. Massey had no concerns about appellant's mental health and whether appellant understood what he had done.

The police officer who secured and searched appellant's residence after the offense testified that he observed a collage on the wall of appellant's living room that featured photographs of appellant and Rachel together. There were also photographs of Rachel on appellant's night stand and computer desk. A desk calendar included a notation of "Rachel's birthday" on March 30, as well as other appointments. The residence appeared clean and organized. The officer also recovered a box of .45 caliber bullets, an empty gun case, and a sharpshooter badge. Entries from appellant's journal reflected that as of January 13, appellant idolized Rachel and was imagining their future together, but by March 4, his relationship with Rachel was deteriorating, and he was hurt and confused.

A Mental Health Mental Retardation ("MHMR") counselor testified that she met appellant in the mental health cell at the jail on a Monday after receiving a report of suicide concerns that had been made after hours on the preceding Friday. When the counselor saw

appellant, he had symptoms consistent with depression, but he "no longer appeared to be in imminent risk of harm to himself or others. . . . [H]e no longer appeared to be in a mental health crisis." He became tearful and made statements consistent with remorse. Because he met the criteria for referral to an MHMR diagnostician, the counselor offered to have a diagnostician come in, but appellant asked to speak to his lawyer first. He appeared rational. The counselor acknowledged that a person can be mentally ill although not in a "mental health crisis," and mental illness can impair a person's ability to intentionally and knowingly cause a result.

A jailer testified that when appellant first arrived in jail, he was placed on suicide watch in a "mental health cell," and he was prescribed medications that he continued to take at the time of trial.

The defense mental health expert, Dr. Roger Saunders, testified that he assessed appellant's mental status a few days after his arrest to address concerns that appellant was a danger to himself. At that time, appellant was suffering from severe depression, but he had begun taking medications and seemed stable. Appellant stated that he would not act out and would work with his attorneys. Saunders met with appellant two more times to assess his competency and sanity. He found that appellant was competent to stand trial and that he was sane, but mentally ill.

Saunders met with appellant a fourth time to determine whether appellant intentionally or knowingly caused the deaths of Rachel and Travis. Saunders administered personality and depression inventories and reviewed numerous records concerning appellant's background

and the offense.  He concluded that appellant intentionally and knowingly shot the victims but did not intentionally or knowingly cause their deaths.  Saunders testified that, before appellant joined the military, he was sensitive and had some dependency and drinking issues.  His experience in military service changed him, as evidenced by his more pronounced dependency issues and excessive drinking, the suicidal episode in August 2008, and his anxiety disorder and PTSD.  These problems led to appellant's very poor functioning in relationships.

Saunders opined that, at the time of the offense, appellant's anxiety and intense emotion prevented him from understanding that his conduct could cause death.  Appellant's goals were to prevent Rachel from leaving without talking to him and to prevent Travis from helping her leave.  Saunders testified that it is well documented that PTSD, combined with depression, increases the risk that a person will act out violently against a partner.  Soldiers and peace officers have a higher incidence of partner abuse than the general population because their jobs generate high levels of stress and anger.  Because they cannot act out in the situations that actually cause the stress and anger, they are more likely to display "displaced aggression" and act out in other situations.  Appellant had some features of dependency and depression before he joined the military, and these features were more pronounced afterward. Appellant's family members did not know how to talk about negative feelings.  Several close family members had mental illnesses, including depression and alcoholism, making it more likely that appellant would also have problems with mood and mental illness.

Saunders testified that when appellant committed the offense, he was acting to save his relationship with Rachel. Appellant understood what was happening when he pointed his gun at Rachel and told her it was loaded. He was not psychotic, delusional, or having a flashback, but his judgment and rational thinking were grossly impaired. Even though appellant's acts during the offense were intentional, the result was not what he wanted, and he did not intend to kill Rachel or Travis. At the time of the offense, appellant was in a "mental health crisis" and did not know what he was thinking, but when questioned after the crisis had passed, he tried to cooperate with detectives and come up with an explanation for what he had done. When appellant gave his statement to police, he was trying to make sense of what had happened and why. Saunders, however, acknowledged that appellant's conduct during the offense was consistent with his conduct in his prior relationship with Leah, in which he displayed a similar lack of boundaries and over-involvement.

Several witnesses testified for the State at punishment. Amanda Ward, appellant's ex-girlfriend from high school, testified that in 2001, appellant became jealous and angry when she talked to another boy at a party. His behavior on that occasion frightened her, and as a result, she told him that she did not want a boyfriend. However, he did not want to break up, and he kept trying to contact her.

James Pawlowski testified that he knew appellant and Leah from the time they were in high school. He testified that, in July 2007, appellant attempted to take Leah from Pawlowski by force when she was sitting in his truck one evening. In a later incident, appellant retaliated against Pawlowski and threatened to kill him.

Sergeant Noel Shelton testified that on July 30, 2007, he responded to a call around 4:00 a.m. regarding someone trying to break into a house. When Shelton arrived, he walked around the house carefully because he had been advised that the suspect was a former Marine. He saw appellant lying under some bushes and ordered him to show his hands. Appellant complied. When Shelton handcuffed appellant, he smelled a strong odor of alcohol and observed that appellant was so intoxicated that he was unsteady on his feet. Shelton arrested appellant for public intoxication, told him that he was prohibited from going onto that property, and explained that he could be arrested if he set foot there again. Appellant seemed to understand. He was visibly upset, began to cry, and signed the trespass warning. However, appellant returned to the house the next day. These events led to the issuance of stalking and trespass warrants against appellant.

Leah and her mother, Joanne Mathis, testified that appellant physically and verbally abused Leah and would not leave her alone when Leah tried to end their relationship. Leah and her family did not pursue criminal charges against appellant because they believed that he needed mental health treatment.

Appellant's case at the punishment phase included the testimony of many teachers, friends, supervisors, family members, and coworkers, as well as jail staff and two pastors who had ministered to appellant in jail. They testified about appellant's family background, childhood, admirable qualities, good works, and ability to function well in a highly structured setting. Several Marines who served with appellant testified about their and appellant's horrible experiences in Iraq and the lasting negative effects of those experiences. Other

witnesses testified about the changes they observed in appellant after he returned from Iraq, including being extremely needy and depressed and exhibiting PTSD symptoms such as a startle response, hypervigilance and paranoia in crowds, and nightmares.

## SUFFICIENCY OF THE EVIDENCE

In point of error one, appellant asserts that the evidence is insufficient to support an affirmative finding to the future dangerousness special issue.[6] He asserts that there was no evidence that he would pose any danger to society if he received a sentence of life in prison without parole. He argues that the evidence showed that he did not have problems interacting with women with whom he was not romantically involved, and he behaved well in structured environments like school, work, the military, and jail.

When reviewing the future dangerousness special issue, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found beyond a reasonable doubt that there is a probability that appellant would commit criminal acts of violence constituting a continuing threat to society.[7] "Society" in this context includes both the free world and prison society.[8] The facts of the offense alone may be sufficient to sustain the jury's finding of future dangerousness.[9]

Viewed in the light most favorable to the verdict, the evidence in this case shows that

---

[6] Appellant does not challenge the sufficiency of the evidence of his guilt.

[7] *Martinez v. State,* 327 S.W.3d 727, 730 (Tex. Crim. App. 2010).

[8] *See, e.g., Druery v. State,* 225 S.W.3d 491, 507 (Tex. Crim. App. 2007).

[9] *Martinez,* 327 S.W.3d at 730.

appellant shot Rachel because he was angry and jealous and believed that he had nothing to lose because Rachel was going to leave him anyway. He shot Travis because he did not want Travis to stop him from getting to Rachel. Carrying a pistol loaded with seven .45-caliber hollow-point bullets and an extra magazine of bullets, he used the garage entry code to enter the victims' home at night while they were away.[10] Appellant hid in Rachel's room for hours so that he could surprise her as she entered her own bedroom. When Travis came home, appellant did not make Travis aware of his presence. Appellant texted Rachel, falsely stating that he was staying at a friend's house so that she would not suspect that he was lying in wait for her.[11] Appellant shot both Rachel and Travis with multiple fatal shots, and he fired some of those shots while Rachel was facing away from him and after Travis had begun to turn away from him.[12] Appellant was working entirely alone, against the advice of numerous friends and mentors who had encouraged him to give Rachel the space she wanted and to find activities he could pursue with his other friends.

Appellant's ex-girlfriend, Leah, and her mother testified that he was physically and verbally abusive of Leah and that he would not leave her alone when she tried to end their

---

[10] *See, e.g., Broussard v. State,* 910 S.W.2d 952, 956 (Tex. Crim. App. 1995) (defendant's conduct of secreting his wife's key and entering her home at night was evidence of his calculation and forethought in murdering her).

[11] *See, e.g., Dinkins v. State,* 894 S.W.2d 330, 360-61 (Tex. Crim. App. 1995) (finding evidence of pre-planning when appellant arranged meeting with victim using false name and hid pistols in a sling he wore for his injured shoulder).

[12] *See id.* at 359-60 (finding it significant that appellant fired additional fatal shot to victim's head after she had fallen from the first fatal shot to her abdomen; infliction of multiple wounds at close range indicated a wanton and callous disregard for human life).

relationship.[13] Leah testified that appellant would choke her, beat her, and hurt her in other ways; afterward, he would tell her that she was weak for crying about it. He sometimes threatened men who talked to her. On at least two occasions, he tried to drag her away from the company of other people. Appellant's physically abusive conduct usually occurred while he was under the influence of alcohol, but one of the worst episodes of abuse occurred when he was sober and they were not dating.

When Leah finally tried to end all contact and told appellant that she wanted him to stay away from her, appellant refused to leave her alone. One night, he sneaked into her house to wait for her after her parents had gone to bed. He left when her mother discovered him in the hallway and told him to go home. Another night, after Leah did not return his repeated telephone calls, appellant appeared outside her house, tapping on her bedroom window and telling her to let him in because they needed to talk. She was too frightened to move, so appellant began tapping on her brother's bedroom window and asking to be let in. Her brother informed their parents, who called the police. The police discovered appellant hiding in the bushes near her brother's window. Appellant was arrested for public intoxication and given a criminal-trespass warning, and after he showed up again the next day, he was charged with criminal trespass. Leah obtained a protective order, but she decided not to pursue any criminal charges against appellant because she and her family

---

[13] *See, e.g., Broussard,* 910 S.W.2d at 956 (appellant's prior assault conviction for hitting murder victim in the face with his fist, and her mother's testimony that she was divorcing him because he beat her, were evidence supporting affirmative future dangerousness determination).

believed that he needed mental health treatment.

James Pawlowski, who knew appellant and Leah from high school, testified that he and Leah were visiting some friends one evening in late July 2007. He and Leah were talking while sitting in his truck in front of their friends' house. They saw appellant drive up and look into Leah's vehicle. When appellant saw that it was empty, he approached the house. After learning that Leah was not inside, he walked to Pawlowski's truck and tried to open the door. Pawlowski called some friends to help him. Appellant then opened the passenger-side door and grabbed Leah by the arm. Appellant tried to pull her out, but she did not want to go. Pawlowski held Leah in the truck from the driver's side and told appellant that she did not want to go with him. Appellant finally released Leah after Pawlowski's friends arrived, and Pawlowski started to drive away. Appellant held on to his truck for a short distance before jumping off.

A few months later, while Pawlowski was at a party, appellant grabbed his collar from behind and threw him down onto his back, telling him that he was not supposed to be there. Appellant told him that if he and Leah went anywhere near him, he would kill them or at least kill Pawlowski.

An ex-girlfriend from high school, Amanda Ward, testified that in 2001, she and appellant dated for about a month. After she talked to another boy at a party, appellant became jealous and angry and confronted the other boy. Appellant then told Ward that they were leaving, and she and her best friend got into appellant's truck. It was raining hard on the drive home, and appellant drove erratically and too fast. When they reached her friend's

house, appellant got out of the truck and started telling Ward that he "just wanted to talk." She told him that she did not want a boyfriend, but he kept trying to talk her into staying in the relationship, saying that he loved her. He had never said anything like that before. Ward's friend was afraid of appellant and urged Ward to stay at her house and not go home with him. Appellant finally left after the girls went inside the house. Once appellant was gone, Ward stayed at her friend's house for about ten minutes, and then she went home. Later, while Ward was watching TV and talking on the telephone in her bedroom, she heard tapping noises and a voice at her bedroom window. When she moved closer to her window, she could hear appellant telling her that he wanted to talk to her. When she opened her blinds, she saw him peering into her window. She cracked her window and told him that he needed to leave. He tried to put something under the window to keep it open, but she pushed the window closed. Eventually Ward heard appellant leave. It sounded to Ward as if appellant's truck was already down the road when he started the motor. His truck was "loud" and she would have expected to hear it when he arrived if he had parked in front of her house.

Appellant returned later, and this time she heard him pull up in front of her house. She called a male friend to come over to help her. That friend confronted appellant outside, and the two boys argued. Appellant told Ward's friend that he just wanted to talk to her, and her friend punched him. Appellant got back into his truck. Ward's parents woke up and told both boys to leave before they called the police. Appellant "peeled out" as he drove away. After that, he left numerous messages on Ward's phone, saying that he "just want[ed] to talk

to" her and that he was sorry. She never called him back, and she avoided going places where she thought he might be. Given this evidence, a rational juror could believe that appellant's conduct in his romantic relationships had grown progressively more violent and dangerous over time, with appellant becoming increasingly aggressive in his efforts to control, isolate, and harm his girlfriends when they made him unhappy.

The psychological evidence presented at the guilt phase indicated that, before the offense, appellant suffered from depression, abused alcohol, had dependent personality traits, and exhibited PTSD symptoms. At the time of the offense, he was not taking his prescribed anti-depressant medications, and he was tapering off his counseling sessions because he did not believe that he needed them. In his last session with Cannon on the Wednesday before the offense, appellant seemed irritable and tired, and he complained of having problems in his relationship with Rachel. When he discussed his relationship problems with his friends, he indicated that he knew he needed to leave Rachel alone, but he did not do so. Instead, he became more demanding, aggressive, and intrusive.

Appellant attempts to bring his case within the ambit of our holding in *Berry v. State*.[14] But appellant's attempt to analogize the evidence of his future dangerousness to the future-dangerousness evidence presented in *Berry* fails. In *Berry,* we found the evidence insufficient to establish future dangerousness and reformed Berry's death sentence to life

---

[14] 233 S.W.3d 847 (Tex. Crim. App. 2007).

imprisonment.[15] Given the extremely circumscribed nature of Berry's victim pool (a subset of her own children), and the substantial affirmative evidence that she had never been violent in response to any other stimulus in any other context, we held that the State did not meet its burden of proving beyond a reasonable doubt that there was a probability that Berry, if allowed to live, would commit criminal acts of violence in the future so as to constitute a continuing threat, whether in or out of prison.[16]

By contrast, appellant does not assert, and our independent review of the record does not reflect, that his victim pool would necessarily be as circumscribed as Berry's.[17] The State presented evidence that appellant had been communicating with an old girlfriend while in jail awaiting trial. The jail nurse who treated appellant acknowledged that inappropriate relationships between inmates and jail staff occurred, although they were rare and would be stopped upon discovery. In short, the evidence suggests that appellant's potential victim pool is not so limited as in *Berry*.

Moreover, in addition to appellant's history of aggression and intrusiveness toward the women who were the objects of his romantic attention, the evidence showed that appellant had a history of acting aggressively and violently toward anyone he believed was

---

[15] *See id.* at 862-64.

[16] *Id.* at 863-64.

[17] *See, e.g., Estrada v. State,* 313 S.W.3d 274, 282-283 (Tex. Crim. App. 2010) (in determining future dangerousness, jury is asked to decide whether a defendant would be dangerous whether in or out of prison, without regard length of time the defendant would actually spend in prison if sentenced to life).

interfering with his access to those women. He confronted a boy who talked to Ward at a party in 2001; he threatened and attacked Leah's friend in 2007; and finally, he shot Travis three times when Travis stepped out of his bedroom. This evidence of appellant's willingness to attack anyone who stood in his way signifies a general disregard for human life. As in *Lucio v. State*, and unlike in *Berry*, "the evidence in this case suggests a finding that appellant is dangerous to a broader range of potential victims both inside and outside of prison."[18]

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt that there was a probability that appellant would commit criminal acts of violence constituting a continuing threat to society. Point of error one is overruled.

In point of error seven, appellant asserts that the evidence does not support a negative answer to the mitigation special issue. He urges this Court to review all the evidence and find that the jury's negative answer to the mitigation special issue in this case offends constitutional prohibitions against cruel and unusual punishment and that the death penalty should not be imposed.

Appellant acknowledges that we have consistently held that we will not conduct a sufficiency of the evidence analysis for mitigation, reasoning that no evidence is *per se*

---

[18] 351 S.W.3d 878, 903 (Tex. Crim. App. 2011).

mitigating.[19]   Appellant argues, however, that the United States Supreme Court has recognized that some evidence is, in effect, mitigating *per se,* such that the death penalty may not be imposed regardless of the facts of the crime and any evidence that militates in favor of the death penalty.  In support, he points to *Roper*'s categorical bar against executing juveniles and *Atkins*' categorical bar against executing the mentally retarded.[20] He urges that these cases effectively extended the courts' prior recognition of youth and low intelligence as mitigating evidence, such that "if the mitigating evidence is substantial enough, it should bar the imposition of the death penalty as a matter of law."  Appellant reasons that this recognition that some evidence is mitigating *per se* is the "functional equivalent of a sufficiency analysis," and therefore this Court should evaluate the sufficiency of the mitigating evidence.  Appellant argues that the mitigating evidence in this case, particularly evidence of his mental illness and military service, is substantial enough to be mitigating *per se.*[21]

---

[19]  *See, e.g., Escamilla v. State,* 143 S.W.3d 814, 828-29 (Tex. Crim. App. 2004).

[20]  *See Roper v. Simmons,* 543 U.S. 551, 564-68 (2005); *Atkins v. Virginia,* 536 U.S. 304, 312-16 (2002).

[21]  Appellant relies on *Bigby* and *Porter* to support his argument that evidence of a defendant's military service and mental illness is mitigating *per se.  See Bigby v. Dretke,* 402 F.3d 551, 565-67 (5th Cir. 2005); *see also Porter v. McCollum,* 558 U.S. 30 (2009).  Appellant reads these cases too broadly.  *Bigby* stated only that the defendant's evidence—that he could not conform his conduct to the law as a result of his chronic and uncontrollable mental illness—had a "double-edged sword" quality, such that a nullification instruction did not allow the jury to give effect to the mitigating value of this evidence.  402 F.3d at 571-72.  In addition, *Porter* concerned the Sixth Amendment right to the effective assistance of counsel to investigate and present potentially mitigating evidence of the defendant's troubled history, character, and background;

(continued...)

We disagree with appellant's interpretation of *Roper* and *Atkins*. In both of these cases, the United States Supreme Court surveyed trends in state legislative enactments and practices that reflected a national consensus in favor of barring the execution of juveniles under eighteen years of age and the mentally retarded.[22] Contrary to appellant's assertions, these decisions did not merely extend prior mitigation jurisprudence to find that evidence is mitigating *per se* if it is "substantial enough"; rather, they determined that juvenile and mentally retarded defendants are categorically ineligible for the death penalty under the Eighth Amendment. The Supreme Court left to the individual states the task of developing appropriate ways to enforce the constitutional restriction on the execution of sentences.[23]

In contrast to *Roper* and *Atkins,* we discern no emerging national consensus in favor of barring the execution of defendants convicted of capital murder who have served in the military, or who have been diagnosed with mental illness, or both.[24] At the punishment phase of a death-penalty case, evidence of a defendant's military service and mental illness is relevant evidence that should be considered by the jury along with other relevant punishment-phase evidence. The weighing of this type of evidence is a subjective determination

---

[21](...continued)
*Porter* did not identify any evidence as mitigating *per se*. 558 U.S. at 40-41.

[22] *See Roper,* 543 U.S. at 564-68; *Atkins,* 536 U.S. at 312-16.

[23] *See Atkins,* 536 U.S. at 317.

[24] *See, e.g., Mays v. State,* 318 S.W.3d 368, 379-80 (Tex. Crim. App. 2010).

undertaken by each individual juror, and this Court will not review it for sufficiency.[25]

Here, the jury was presented with evidence of appellant's admirable performance during his military service, his fellow soldiers' and superior officers' high regard for him, the awards and promotions he received, his harrowing experiences during his service, the ways in which these experiences affected him, and the problems he had in adjusting to civilian life after he returned from Iraq. The jurors weighed this evidence along with other relevant evidence and made a normative judgment about appellant's moral blameworthiness. This Court will not second-guess the jury's determination. Point of error seven is overruled.

## GUILT PHASE

In point of error two, appellant asserts that the trial court erred by allowing the State to introduce, at the guilt phase, prejudicial background, victim-character, and victim-impact evidence over appellant's Texas Rule of Evidence 403 objection.[26] Appellant complains of twenty-seven items of information that came in as background evidence during the testimony of Wayne Joiner,[27] the victims' father; Douglas Perry, Travis's college friend; and Johnny Matthys, Rachel's ex-boyfriend.[28]

---

[25] *Broussard,* 910 S.W.2d at 956.

[26] Unless otherwise indicated all references to Rules refer to the Texas Rules of Evidence.

[27] Because the record includes several members of the Joiner family, we will refer to members of the Joiner family by their first names.

[28] Appellant describes those items of information as:
  (1)     The victims were siblings and they had one brother, Evan.

(continued...)

Before Wayne testified as the State's first witness, the parties and the court conferred

outside the jury's presence about the admissibility of victim-background evidence.  Defense

---

[28](...continued)

(2) Travis would have been twenty-five on May 21.

(3) Rachel would have been twenty-three.

(4) Evan is sixteen.

(5) The siblings were photographed together on Travis's senior ring day.

(6) The victims lived in a house owned by their parents, which was bought for the victims to use while attending school.

(7) Both victims had vehicles while in school.

(8) Travis lived in the house first with three other boys.  Each had his own room.

(9) Travis always wanted to work in the aerospace industry.  He chose to attend Texas A&M over MIT.

(10) Rachel initially attended TCU.  She had a partial track scholarship to attend TCU.  She loved track.

(11) The "track thing" did not work out, so Rachel transferred to Texas A&M.

(12) After moving to College Station, Rachel lived in an apartment, but after Travis's housemates graduated, she moved in with her brother.

(13) Rachel's parents were comforted that she was living with her brother.

(14) Travis wanted to be an aerospace engineer.

(15) Rachel was not sure what she wanted to do with her life.

(16) Rachel and Travis's parents lived in Eldorado, Texas.

(17) Sometimes Rachel would bring a boyfriend to her parents' home.  She brought appellant to their home on one occasion, and he spent a few days there.

(18) The family and appellant did some target practice together.

(19) Rachel was a tidy person, but Travis was not.

(20) Travis had a friend named Douglas Perry.  They met as residents of the freshman honor dormitory.

(21) As sophomores, Travis and Perry became roommates.

(22) After Travis moved into the house, Perry would often visit to watch television and play video games with Travis.

(23) Travis was to graduate in December 2009.

(24) Travis was a comic book fan.

(25) Travis had a telescope and had always had one while Perry knew him.

(26) Travis liked LEGO and liked to build things with them.

(27) Rachel met her ex-boyfriend, Matthys, at Hurricane Harry's.  Matthys saw her sitting alone.  He approached and spoke with her, and then they danced the two-step.

counsel objected that victim-background information was not relevant at that point in the proceedings, and that if the court found it to be relevant, then it was more prejudicial than probative under Rule 403. The prosecutor asserted that he intended to call the victims' father to provide background evidence, "just to give a face to the victim[s]." The judge ruled that he would allow this evidence, but he admonished the prosecutor to "keep it to a minimum." The judge then granted appellant's running objection to this evidence.

Wayne then testified. He described his occupation and family life, stating that he had been married for thirty-three years and had three children, the youngest of whom was sixteen. He lived with his family in Eldorado, Texas. A photograph of Wayne with the victims was offered and admitted as State's Exhibit 1, with defense counsel expressly stating "no objection." Wayne explained that the photograph was taken the day that Travis got his high school senior ring. He then explained that he and his wife bought a house for Travis in April 2007 so that Travis would have a place to live while he finished college, and so Rachel would also have a place to stay if she decided to go to school in College Station. Photographs of the house and the victims' vehicles were then offered and admitted as State's Exhibits 2 through 4, with defense counsel expressly stating "no objection." Wayne described the vehicles as the cars that he and his wife had given to the victims when they were seniors in high school. Diagrams of the house floor plans were offered and admitted as State's Exhibits 5 and 6, with defense counsel expressly stating "no objection." Wayne explained that Rachel lived upstairs, Travis lived downstairs, and the two shared the kitchen.

Wayne also testified that Travis had always wanted to study aerospace engineering,

and he considered attending MIT before deciding that he wanted to stay in Texas. He related that Rachel started college at TCU on a track scholarship, but track "didn't work out for her," so she moved to College Station. Rachel initially had her own apartment, but she moved into the house after Travis's roommates graduated. Wayne testified that he and his wife were glad that Rachel and Travis were in the same house. They did not know what Rachel's major would be, although she "had a lot of ideas of what she wanted to do."

Wayne described how he met appellant. He explained that Rachel and appellant were dating but not engaged, and appellant came to visit them between Christmas of 2008 and New Year's Day of 2009. Appellant stayed two nights in Travis's boyhood bedroom. Photographs of the family home in Eldorado were offered and admitted as State's Exhibits 8 and 9, with defense counsel expressly stating "no objection." State's Exhibit 7, a photograph of appellant's car at the family home, was also admitted with "no objection." It was not unusual for Rachel to bring boys home from college, and nothing stood out about appellant's visit. While appellant was there, he participated with the family in day-to-day activities such as eating dinner, watching movies, and going to church. In addition, appellant and the family practiced target shooting together at a rock quarry on the property. Photographs of the rock quarry were offered and admitted as State's Exhibits 10 and 11, with "no objection." Wayne observed that appellant appeared to be comfortable with firearms. He was a good shot, and he helped Rachel with her shooting. Appellant did not seem nervous or bothered by the noise. Wayne did not know much about appellant except that he was a former Marine. Appellant's visit ended before the victims returned to College Station.

Rachel returned to College Station a couple of days before Travis so that she could clean and decorate the house before classes started. She was a tidy person, while Travis was not. Wayne last heard from Travis a week before the offense. He last heard from Rachel a couple of days before the offense. After the sheriff's office personnel in Eldorado contacted him by telephone, he went to the station, where they told him that the victims had been shot and killed.

After Wayne testified, two of the victims' neighbors testified about their observations on the day of the offense. Appellant's friend Brian Keith testified about his telephone conversation with appellant on the night before the offense, and then Perry testified. The defense did not object in advance to Perry's testimony. Perry testified that he first met Travis in August 2004, when they were in the freshman honors dormitory. He explained that he was majoring in computer science and that Travis was majoring in aerospace engineering. The prosecutor asked him how long it took them to become friends. Defense counsel objected under "Rule 403, relevancy, [and] Rule 404." The prosecutor responded that this information was not prejudicial and that it explained why Travis and Perry were out together on the night before the offense. The court overruled the objection.

Perry then testified that he and Travis got to know each other when they were sophomores. He described the victims' family as consisting of Wayne, Shirley, Travis, Rachel, and a younger brother, Evan. Perry and Travis shared an apartment in the summer of 2007. After Travis moved into the house, Perry visited him there quite often. He also saw Rachel there, and he met appellant. Appellant was frequently there at the same time as Perry.

Perry described appellant's car, and he explained how the victims and their friends, including appellant, would usually park their cars in the driveway and in front of the house.

Perry testified that, on the night before the offense, Travis drove Perry and another friend to Tomball to see a midnight showing of a movie, *The Watchmen,* on an IMAX screen. They were fans of the graphic novel on which the movie was based. They arrived in Tomball early to pick up their tickets, and then they ate supper at a Subway restaurant. They waited around in a Walmart, looking at toys and playing Guitar Hero, until it was time for the movie. Travis was a big fan of LEGO and liked to build things; he looked at LEGO sets in Walmart to see what new products were available. After the movie, they returned to College Station. Travis dropped his friends off at their houses on his way home.

Photographs of Travis's bedroom were offered and admitted as State's Exhibits 18 through 20, and photographs of Travis and Rachel were offered and admitted as State's Exhibits 43-A and 57, with "no objection." One photograph of Travis's bedroom depicted a guitar-shaped bottle that Perry thought "used to contain an alcoholic beverage," and another depicted a telescope. The prosecutor asked Perry if Travis had a telescope for as long as Perry knew him. Perry answered affirmatively. Defense counsel then objected "to relevance, 403 and 404." The prosecutor responded that he was "just showing the part of the house where the shooting happened . . . and showing where Travis's room was and Rachel's room as well." The judge stated, "All right," and then the defense requested a running objection "pertaining to all questions of character and victim-impact . . . under Rule 403." The court denied the request for a running objection, stating, "No. I think we'll just take them up one

by one." Perry identified State's Exhibit 19 as a photograph that included Travis's telescope and State's Exhibit 20 as a photograph of Travis's room that depicted its typically messy condition, his computer, and a copy of the graphic novel, *The Watchmen.* The prosecutor then passed the witness for cross-examination.

After Perry's testimony, Matthys testified. He stated that he met Rachel in August 2007 at a dance hall in College Station. He saw her sitting alone and introduced himself, and then they talked and danced. They went to her place and watched movies for the rest of the night. He felt instantly attracted to her. She had attended TCU for a couple of years before moving to College Station.

At that point, defense counsel requested and received a hearing outside the presence of the jury. Counsel objected under Rules 401, 402, 403, and 404 to the "State's continual admission of evidence of the character and personality and qualities of the victim." The prosecutor responded that this type of evidence was found to be admissible in *Renteria v. State*.[29] The prosecutor stated that in *Renteria,* the victim's mother's testimony about where the victim attended school, what type of student she was, and what she liked to do, was not improper victim-impact evidence. The prosecutor stated that he was just "giving background about the two human beings. . . . Everything we're saying is setting up the situation that brought us here today."

Defense counsel responded that the prosecutor was introducing victim-impact and

---

[29] 206 S.W.3d 689 (Tex. Crim. App. 2006).

victim-character evidence under the guise of background evidence to show the jury that the lifeworthiness and value of the victims was greater than the lifeworthiness and value of appellant. Counsel further argued that the prejudicial nature of this evidence outweighed its relevance. The trial court then stated, "I am going to allow you to put a face on the victims, but it does seem to me that maybe you-all have gone a little too far on that. I am going to overrule the objection at this time." The court continued, "I will give a running objection to you on that from here on . . . with this witness. But I may be quick to sustain objections in the future if we get too much."

Defense counsel's initial running objection to victim-background information on the grounds of relevance and unfair prejudice was sufficient as a general matter to preserve error with respect to most of Wayne's testimony.[30] However, during Wayne's testimony, defense counsel expressly stated "no objection" as photographs of the victims, their family, and the family home were offered into evidence while Wayne described the content of the photographs and when and where they were taken. Therefore, error was not preserved as to the photographs and Wayne's descriptions of them.[31]

---

[30] *See, e.g., Ford v. State,* 919 S.W.2d 107, 113-14 (Tex. Crim. App. 1996) (when record reflected that appellant clearly objected "to any and all impact evidence" as to "all witnesses," and the trial court clearly understood the complaint and overruled it, running objection was sufficient to preserve claim for appellate review).

[31] *See, e.g., Estrada v. State,* 313 S.W.3d 274, 301-02 (Tex. Crim. App. 2010) (appellant failed to preserve any error in the admission of State's exhibits when defense counsel stated "no objection" to their admission); *see also Thomas v. State,* 408 S.W.3d 877, 884-85 (Tex. Crim. App. 2013) (rejecting mechanical application of rules of error preservation and waiver; a statement of "no objection" should not be viewed in isolation but should be considered in the

(continued...)

Although we conclude that defense counsel's initial running objection preserved error regarding most of Wayne's testimony, we doubt that the objection was sufficient to preserve error regarding Perry's testimony. Appellant made his running objection before Wayne testified. After Wayne testified, several witnesses testified about matters unrelated to the victims' backgrounds before Perry was called to testify.[32] Defense counsel did not object when Perry testified that he met Travis in the freshman honors dorm. Rather, counsel first objected when the prosecutor asked Perry how long it took him to become friends with Travis. When the court overruled that objection, Perry answered the question. This objection, and the trial court's overruling of it, are some indication that appellant and the trial court recognized that the prior running objection to victim-background and -character evidence did not extend to this witness. Defense counsel next objected after an exchange in which Perry viewed a photograph of Travis's room that included his telescope and responded affirmatively to the prosecutor's question of whether Travis always had a telescope. This

---

[31](...continued)
context of the entirety of the record as it reflects the parties' and court's understanding).

[32] *See, e.g., Sattiewhite v. State,* 786 S.W.2d 271, 283 n.4 (Tex. Crim. App. 1989) (citing *Goodman v. State,* 701 S.W.2d 850, 863 (Tex. Crim. App. 1985), which held that a defendant's "running objection to all questions concerning the offense, the nature of the offense, and everything related to the offense," made during the State's cross-examination of one witness, was not sufficient to preserve error with respect to a different witness who testified after the intervening testimony of six other witnesses); *cf. Ford,* 919 S.W.2d at 112-14 (a running objection based upon relevance and Rule 403 "as to any and all impact evidence" was sufficient to preserve error as to several witnesses who were called consecutively to testify about impact of offense and victim's death).

objection came too late to preserve error concerning that exchange.[33] The other complained-of items of information in Perry's testimony came in without a timely objection, and so appellant also failed to preserve error regarding those parts of Perry's testimony.

Toward the end of Perry's testimony on direct examination, the trial court expressly refused to grant appellant a running objection under Rule 403. Therefore, no running objection applied when Matthys testified. Further, appellant did not timely object to the complained-of information that was presented through Matthys's testimony. Thus, appellant failed to preserve error regarding Matthys's complained-of testimony. Accordingly, we will not address the merits of this part of appellant's point of error two.

However, because appellant's running objection to relevance and undue prejudice preserved error concerning most of Wayne's testimony and, arguably, the first part of Perry's testimony, we will address that part of appellant's point of error two on the merits. Background evidence is, generally speaking, relevant because it is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."[34] Appellant acknowledges that "some background evidence is permissible to help the jury understand the events surrounding the alleged offense."[35] All relevant evidence is admissible, except as

---

[33] *See Luna v. State,* 268 S.W.3d 594, 604 (Tex. Crim. App. 2008).

[34] Rule 401.

[35] *See* Article 38.36 (in all prosecutions for murder, either party shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous

(continued...)

otherwise provided by law.[36]

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice.[37] This rule favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial.[38] The term "probative value" refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for it.[39] "Unfair prejudice" refers to an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.[40] Rule 403 bars the admission of the offered evidence only when there exists a clear disparity between its degree of prejudice and its probative value.[41]

Some victim-background evidence is admissible to establish the framework and

[35](...continued)
relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the accused's condition of mind at the time of the offense).

[36] Rule 402.

[37] Rule 403; *Davis v. State,* 329 S.W.3d 798, 806 (Tex. Crim. App. 2010).

[38] *Williams v. State,* 958 S.W.2d 186, 196 (Tex. Crim. App. 1997).

[39] *Casey v. State,* 215 S.W.3d 870, 879 (Tex. Crim. App. 2007).

[40] *Montgomery v. State,* 810 S.W.2d 372, 378 (Tex. Crim. App. 1990) (citing Advisory Committee's notes to Federal Rule of Evidence 403).

[41] *Davis*, 329 S.W.3d at 806.

context of the offense.[42]  However, typical "victim-impact" evidence—evidence concerning the physical, psychological or economic effect of the crime on the victim's family[43]—generally lacks "any tendency to make more or less probable the existence of any fact of consequence at the guilt stage of trial."[44]   In addition, evidence of a victim's good or peaceable character is generally not admissible at the guilt phase because it is irrelevant or unfairly prejudicial.[45]

Questions of admissibility of evidence in general are subject to an abuse of discretion

---

[42] *Compare Matchett v. State,* 941 S.W.2d 922, 931 (Tex. Crim. App. 1996) (finding no error in trial court's overruling objection to admission of victim's widow's testimony that she had been married to the victim for twenty-five years, they had five children, and the victim was home alone on the night of his murder, and also identifying her husband in a photograph of him with friends), *with Renteria,* 206 S.W.3d at 705-06 (victim's mother's testimony about where the victim went to school, what type of student she was, and what she liked to do, was not victim-impact testimony because it did not concern how the murder affected the mother or her family's life, and so trial court properly overruled objection that her testimony constituted victim-impact evidence – although the record showed that she cried during her testimony); *see also DeLarue v. State,* 102 S.W.3d 388, 403-04 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (victim's mother's testimony reciting basic facts surrounding how she learned of her daughter's death, including that she learned of it just before victim's child's birthday, and identifying photographs of the victim that predated the offense, was not "victim-impact" evidence because this evidence did not concern the physical, psychological or economic effect of the crime on the victim or her family; rather, it showed the witness properly fixed the date of the event in her mind and provided victim-background information).

[43]  See *Matchett,* 941 S.W.2d at 931.

[44]  *See Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990) (holding that evidence of future hardship for attempted murder victim *himself* on account of his paralysis caused by the assault was not admissible at the guilt stage of trial, citing TEX. R. CR. EVID. 401, now TEX. R. EVID.401).  If evidence of the impact upon the victim *himself* is typically irrelevant at the guilt phase of trial, evidence of the impact upon *others* is even less likely to be relevant at that phase.

[45] TEX. R. EVID. 404(a).   *See, e.g., Fuentes v. State,* 991 S.W.2d 267, 280 n.6 (Tex. Crim. App. 1999) ("It is never competent for the State to prove the victim's good or peaceable character in the first instance.").

standard on direct appeal,[46] and a trial court is charged with exercising its discretion to distinguish admissible "victim-background" evidence, ostensibly offered as an aid to understanding the context and framework of the offense, from inadmissible "victim-impact" and "victim-character" evidence. The trial court abuses its discretion only when its decision to admit evidence lies "outside the zone of reasonable disagreement."[47]

In this case, most of Wayne's testimony provided general background information about the victims, including their ages and family history, how they came to be living in the house in College Station where they were killed, and Wayne's observations of appellant and Rachel's interactions with him. Such testimony served the proper purpose of aiding the jury in understanding the framework or context of the offense. However, it is arguable that Wayne's testimony about the victims' talents, character traits, and plans for the future exceeded that purpose. Similarly, much of Perry's testimony served the proper purpose of providing a framework or context for the offense, but arguably his testimony about the development of his friendship with Travis, their interests and shared activities, and Travis's status as an honor student exceeded that purpose.

To the extent that this testimony did not aid the jury in understanding the framework or context of the offense, it was not particularly probative of any fact of consequence to the litigation, and the State's need for it was slight. However, the degree of prejudice was also

---

[46] *Walters v. State,* 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

[47] *Davis,* 329 S.W.3d at 803.

slight. The trial court had discretion to find that this testimony did not have an undue tendency to suggest a decision on an improper emotional basis, such that the jurors would convict appellant of capital murder even if they had a reasonable doubt concerning his guilt. We conclude that the trial court did not abuse its discretion by determining that no clear disparity existed between the testimony's degree of prejudice and its probative value. Point of error two is overruled.

In point of error three, appellant asserts that the trial court improperly allowed the victims' neighbor, Tabitha Foreman, to "testify about the emotional state of [appellant]" immediately following the offense. He argues that Foreman's testimony was harmful because it undermined his defensive theory that although he shot the victims, he did not intend to cause their deaths or know that their deaths would result.

Foreman testified about her observations as she was backing her car out of her driveway shortly after the offense, while police and appellant were still at the crime scene. She testified that she saw appellant sitting outside the house in handcuffs. The prosecutor asked her, "Did he – at that point when you saw him, did he seem angry or mad?" Defense counsel objected that the question was speculative. The prosecutor responded that the question was not speculative because Foreman saw appellant and could say whether he was angry from the look on his face. Counsel then asked Foreman on *voir dire* what she saw. She stated that the defendant had a "straight face," and she could see him very clearly. Defense counsel again objected that Foreman's testimony was speculative.

In a hearing outside the presence of the jury, the prosecutor responded that Foreman

could make observations about appellant based on the look on his face, which would be a barometer of his emotional state. Defense counsel continued to object that such an opinion from Foreman would be speculative. The trial court stated, "I think it goes to the weight. I am going to allow him to go into it. However, develop the facial expression before you get to the punch line." In the presence of the jury, the prosecutor again asked Foreman, "From his facial expressions, did he seem to be mad?" Defense counsel objected "under Rules 401 and 403 as speculative." This objection was overruled. Foreman responded that the defendant did not seem to be mad or angry. The State then asked her if appellant had been talking to himself, and she responded that he had not.

On cross-examination, defense counsel asked Foreman, "Did [appellant] have a dazed look on his face?" Foreman responded, "Dazed? I wouldn't call it dazed; no, sir." Then, on redirect, the prosecutor posed the following question: "[Counsel] just asked you if it was a 'dazed look' in the defendant's eye. You said no, you wouldn't call it a dazed look. What would you call it?" Foreman answered, "It was a look of no remorse." Defense counsel did not object to that exchange. On recross, defense counsel asked Foreman whether the defendant was crying when she saw him. She responded, "I didn't see a teardrop." She testified that she got a look at defendant for about seven seconds and made eye contact, which was "why I remember the distinct look that I got."

Rule 701 permits a lay witness to offer opinion testimony if the opinion is (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of

the witness's testimony or the determination of a fact in issue.[48]  The witness must establish personal knowledge of the events from which her opinion is drawn, and her opinion must be rationally based on that knowledge.[49]  An opinion that is an interpretation of the witness's objective perception of events (for example, something the witness saw) will satisfy the personal knowledge requirement.[50]

Although it is impossible for a witness to possess personal knowledge of what someone else is thinking, a witness may possess personal knowledge of facts from which an opinion regarding someone else's mental state may be drawn.[51]  An opinion is rationally based on perception if it is an opinion that a reasonable person could draw under the circumstances.[52]

The witness's opinion must also be helpful to the trier of fact to either understand the witness's testimony or determine a fact in issue.[53]  "Whether an opinion meets the fundamental requirements of Rule 701 is within the sound discretion of the trial court and its decision regarding admissibility should be overturned only if it abuses its discretion."[54]

---

[48]  *See* Rule 701; *Ex parte Nailor,* 149 S.W.3d 125, 134 (Tex. Crim. App. 2004).

[49]  *Fairow v. State,* 943 S.W.2d 895, 898 (Tex. Crim. App. 1997).

[50]  *Id.* at 899; *see also Osbourn v. State,* 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

[51]  *Fairow,* 943 S.W.2d at 899.

[52]  *Id.* at 900.

[53]  *Solomon v. State,* 49 S.W.3d 356, 364 (Tex. Crim. App. 2001).

[54]  *Fairow,* 943 S.W.2d at 901.

In this case, once the State established that Foreman's opinion was based on her perception of appellant's facial expression, the trial court did not abuse its discretion by overruling appellant's objection to "speculation."[55] Point of error three is overruled.

In point of error four, appellant asserts that the trial court improperly admitted State's Exhibit 201, his cellular telephone records documenting calls and text messages in the hours preceding the offense, in violation of his Texas constitutional right to privacy.[56] He argues that obtaining this evidence without a search warrant, court order, or consent violated his right to privacy under Article I, Section 9, of the Texas Constitution, and so the evidence should have been excluded under Article 38.23. Appellant complains that the State made no attempt to show how the documents were obtained. He argues that he was harmed by the admission of the telephone records because they corroborated witnesses' testimony about how, when, and with whom appellant communicated in the hours preceding the offense.

State's Exhibit 201 consists of voluminous business records from appellant's cellular-telephone service provider. The records do not identify the account holders associated with the telephone numbers that connected with appellant's cellular telephone, and so they are not informative in the absence of testimony identifying the account holders and describing the

---

[55] *See Fairow,* 943 S.W.2d at 899 (jury is free to give as much or as little weight to the opinion as it sees fit).

[56] Appellant relies upon *Richardson v. State*, 865 S.W.2d 944, 948, 953-54 (Tex. Crim. App. 1993). In *Richardson,* we concluded that the use of a pen register to track outgoing calls made from a land line "may well constitute a 'search' under Article I, § 9 of the Texas Constitution" and remanded the case to the intermediate court of appeals for a determination of whether such a "search" would be reasonable in the absence of probable cause. *See id.*

content of specific calls and text messages. The State referred to and used these records several times during the trial, without objection, both before and after they were admitted into evidence as State's Exhibit 201. The prosecutor first showed one page of them to appellant's friend, Brian Keith, to confirm the length of time that he talked with appellant by telephone on the night of March 5 when appellant called him for advice about his relationship with Rachel. Although defense counsel initially objected that the entire packet of telephone records was irrelevant, counsel then expressly stated that he had no objection to the State's showing one page to Keith. The State used the records again by showing pages to Perry after Perry testified that he did not recall that appellant had called Travis on the night before the offense. Upon viewing the pertinent telephone record, Perry confirmed that appellant had called Travis one time that night. Defense counsel did not object to this use of the records or to Perry's testimony about the telephone call.

The State used the records in a similar manner when Matthys testified. The State showed Matthys a portion of the records, and he testified that they reflected that appellant called Rachel six times on the morning of March 6. Defense counsel did not object. The State then offered the packet of records "for all purposes" as State's Exhibit 201. Citing *Richardson,*[57] defense counsel objected to their admission, asserting that the telephone records violated the Fourth Amendment of the United States Constitution and appellant's right to privacy under Article I, Section 9, of the Texas Constitution. Defense counsel added

---

[57] 865 S.W.2d 944.

that, if the trial court admitted the records, counsel requested an opportunity to review and object to records of specific telephone calls that might be inadmissible under Rule 403. The court overruled the objection and admitted the records as State's Exhibit 201, with the understanding that defense counsel could review the records and object to records of specific telephone calls under Rule 403.

The records were next used during the testimony of crime-scene investigator Detective Liza Phillips, who viewed them and confirmed appellant's call to Keith on the night of March 5, as well as six calls and thirteen texts from appellant's cellular telephone to Rachel's telephone on the morning of March 6, for a total of nineteen attempts to contact Rachel. Defense counsel did not object to this use of the records or to any of the testimony concerning appellant's telephone communications.

In his recorded statement to police, which was admitted and published to the jury, appellant described his calls to Walker, Keith, and Rachel, and his texts to Rachel before the offense. Only appellant's call to Travis and Phillips's count of the number of calls and texts that appellant sent to Rachel before the offense did not come in through appellant's own statement.[58] Further, appellant does not argue that the State's use of the telephone records depended upon their formal admission as State's Exhibit 201. Moreover, the record does not reflect that their admission as an exhibit had the potential to influence the jury's decision in any way. Thus, even assuming error, it is hard to imagine how admission of State's Exhibit

---

[58] *See Coble v. State,* 330 S.W.3d 253, 282 (Tex. Crim. App. 2010) (erroneous admission of evidence will not result in reversal when other such evidence was received without objection).

201 contributed, even incrementally, to appellant's conviction beyond the use to which the State was allowed to put it *sans* objection.[59] Point of error four is overruled.

In point of error five, appellant asserts that the trial court erred in admitting into evidence over appellant's objections the inflammatory and highly prejudicial photographs of the victims' bodies. Appellant describes State's Exhibits 35 through 39, and 43 through 47, 51, 52, 57, and 58, as "numerous graphic photos depicting the horrific injuries suffered by Travis and Rachel Joiner that led to their deaths." Appellant argues that the photographs were not probative of any issue at trial because he conceded that he shot and killed the victims, and his sole defensive theory concerned his state of mind at the time of the shooting. Instead, they created an extreme risk of unfair prejudice, such that the jurors would not be able to dispassionately weigh the testimony of appellant's mental health expert and consider appellant's theory that he did not knowingly and intentionally cause the victims' deaths.

The admission of photographs over an objection is within the sound discretion of the trial court.[60] Generally, a photograph is relevant if verbal testimony concerning the matter depicted in the photograph is also relevant.[61] Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than

---

[59] *See* TEX. R. APP. P. 44.2(a) (appellate courts must reverse upon finding constitutional error unless it finds beyond a reasonable doubt that the error did not contribute to the conviction).

[60] *Sonnier v. State,* 913 S.W.2d 511, 518 Tex. Crim. App. 1995).

[61] *Gallo v. State,* 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

prejudicial.[62]  However, otherwise relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[63]  A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice, including, but not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed.[64]  The availability of other means of proof and the circumstances unique to each individual case must also be considered.[65]

The State had the burden to prove every element of the offense of intentionally or knowingly causing the deaths of two people during the same criminal transaction.[66]  Thus, the State had to prove not only that the defendant inflicted the injuries that led to the victims' deaths, but also that he acted with the conscious objective or desire to cause death or with awareness that his conduct was reasonably certain to cause death.[67]  The number and location of wounds inflicted are probative of a defendant's intent to kill and his mental state at the

---

[62]  *Id.*

[63]  *Id.*

[64]  *Id.*

[65]  *Id.*

[66]  *See* TEX. PENAL CODE ANN. § 19.03(a)(7).

[67]  *See, e.g., Landrian v. State,* 268 S.W.3d 532, 537 n.27 (Tex. Crim. App. 2008); *see also Medina v. State,* 7 S.W.3d 633, 636 (Tex. Crim. App. 1999).

time of the offense.[68] Additionally, evidence of injury may be probative of the specific circumstances of the murder and the veracity of a defendant's statement to police.[69] Finally, the State was entitled to present to the jury a picture of the events relied upon.[70]

State's Exhibits 35 through 39 are photographs taken at the crime scene. Appellant objected to these exhibits during a hearing conducted outside the jury's presence in advance of the State's calling Matthew Byrnson, an emergency responder from the fire department, to testify. Appellant objected to Exhibits 35 through 37 under Rules 401 and 402 as irrelevant and duplicative because "there ha[d] already been a photograph shown of the condition of Rachel Joiner in State's Exhibit Number 28."[71] He also objected that State's Exhibits 38 and 39 were duplicative because they were similar to a photo of Travis that was already in evidence as State's Exhibit 32.[72] Defense counsel further objected that these

_____

[68] *See Motilla v. State,* 78 S.W.3d 352, 359 (Tex. Crim. App. 2002); *Rojas v. State,* 986 S.W.2d 241, 250 (Tex. Crim. App. 1998).

[69] *See, e.g., Rojas,* 986 S.W.2d at 250.

[70] *See United States v. Fields,* 483 F.3d 313, 354-56 (5th Cir. 2007) (fact to which evidence is directed need not be in dispute); *see also United States v. Cisneros,* 203 F.3d 333, 348 (5th Cir. 2000) (defendant's offer to stipulate to murder victim's shooting did not reduce the probative value of evidence of how victim's parents found their son, pathologist's testimony about victim's autopsy, or photographs of victim's corpse).

[71] State's Exhibit 28 is a photograph of Rachel lying on the floor of the garage, previously introduced during an emergency responder's testimony about how he found her when he responded to the 9-1-1 call. This photograph shows the position of the gun in relation to Rachel. Only her head and shoulder are visible; the rest of her body is obscured by other items in the garage.

[72] State's Exhibit 32 is a photograph of Travis's body lying face down at scene, previously introduced during an emergency responder's testimony about how he found Travis

(continued...)

exhibits were more prejudicial than probative under Rule 403 because they were inflammatory and cumulative. He argued that the photographs were inadmissible because there was no challenge in this case to whether appellant shot the victims; the only question was appellant's mental state, and the photographs were not informative of that. The trial court overruled these objections and granted a running objection so that counsel would not have to repeat his objections when the photographs were offered before the jury.

These photographs were first offered during Byrnson's testimony about his observations and activities at the scene, including his team's efforts to assist the victims. He testified that State's Exhibits 35 through 37 showed Rachel as he saw her lying on the floor of the garage, other than the fact that he and his team put her on the backboard depicted in Exhibit 35. He testified that State's Exhibit 35, a photo depicting Rachel from the hips to the top of her head after emergency responders had placed her on a backboard, showed evidence of a gunshot wound to her chest. Exhibit 36 was a photo of Rachel's bare feet with blood on them. The amount of blood that was visible concerned Byrnson because he did not know what additional internal bleeding there might be. State's Exhibit 37, a photo of Rachel's face with an oxygen mask that emergency responders had placed over her nose and mouth, showed that she was having difficulty breathing. Byrnson explained that Rachel was trying to sit up and was telling him that she could not breathe. She also told him to go get her

[72](...continued)
when he responded to the 9-1-1 call. This photograph was taken by someone standing by Travis's feet and shows his position in relation to the staircase.

brother inside the house. Her skin was very pale, indicative of inadequate perfusion, which was a sign of blood loss, shock, difficulty breathing, and not getting enough oxygen to the blood. She had a gunshot wound on the thumb of her right hand. Based on Byrnson's assessment of the situation, it was evident that Rachel needed to be in an operating room, so they transported her to the hospital. She appeared to be struggling and in pain. After they loaded her onto the stretcher, Byrnson asked her who shot her, and she said, "John did . . . . My boyfriend." At that time she had the same look on her face that was depicted in State's Exhibit 37.

Byrnson testified that after Rachel was loaded into the ambulance, he and his lieutenant immediately went into the house to assist her brother. They entered through the door between the garage and the interior of the house. They observed a lot of blood in the house, and as they turned a corner they saw Travis lying on the floor. Byrnson testified that State's Exhibit 38, a photograph of Travis's head and upper body as he lay face down, accurately depicted Travis as Byrnson first found him. Upon seeing Travis's condition, Byrnson went back to the fire truck to unload a heart monitor, but before he could unload it, a second ambulance pulled up. The responders who arrived in the ambulance carried a heart monitor with them, so Byrnson returned to the house to assist them. Exhibit 39 accurately depicted Travis as he appeared after emergency responders had rolled him onto his back in order to move him to a backboard and load him into the ambulance. Travis had only "pulseless electrical activity" in his heart, meaning that his heart had some activity but was not physically beating and moving fluid. Byrnson did not believe that Travis "had a chance,"

but he performed chest compressions on Travis all the way to the emergency room. Blood came out of an open chest wound during the compressions.

The State used Exhibits 35 and 37 again during the testimony of emergency-responder Michael Butschek. Butschek identified a gunshot wound below the hem of Rachel's shirt in Exhibit 35 and stated that Exhibit 37 accurately reflected the distress that she was in when he found her. He described the lifesaving measures that were taken in the ambulance. He stated that Rachel was suffering and in shock, and she continued having difficulty breathing on the way to the hospital. He confirmed that her injuries were in the center of her body where her vital organs were located.

The other photographs at issue are autopsy photographs. Appellant objected to State's Exhibits 43 through 47, 51, 52, 57, and 58 during a hearing conducted outside the presence of the jury before they were offered during the testimony of Dr. David Dolinak, the medical examiner who autopsied the victims on March 7, 2009. Appellant objected that all of these exhibits were cumulative. He made no other objections with respect to State's Exhibits 43 and 44, which were photographs of Travis's body at the medical examiner's office. Additionally, appellant objected to State's Exhibits 45 through 47 as duplicative because they depicted wounds that were already depicted in Exhibits 43 and 44.

Defense counsel objected to State's Exhibits 51 and 52 as inflammatory because they showed a surgical incision on Rachel's body that was not from the offense itself. He asserted that State's Exhibit 57, depicting entrance wounds on Rachel's back and buttock, and State's Exhibit 58, a close-up view of the wound on her back, were cumulative of State's Exhibits

53 and 54.[73] The court overruled the objection and granted a running objection. The prosecutor made a record that the State had selected seven photographs of Travis and eight or nine of Rachel from out of sixty available autopsy photographs, which were separate and apart from the sixty-six available photographs of the victims at the scene and in the hospital.

Before the exhibits were offered, Dolinak testified before the jury that Travis had one gunshot wound about halfway down his back which cut his spinal cord in half. Another shot entered above his right buttock area and went through his pelvic bone and intestines before lodging in his liver. From the front, Travis had a wound to the upper left side of his chest, near his armpit, as if he were shot from the side. The bullet went across his chest from left to right, angling downward, and lodged in his lower back. It passed through both of his lungs, his heart, and his esophagus. State's Exhibit 43 was then admitted to show the location of the entrance wound in Travis's left upper chest, just above his armpit, and State's Exhibit 44 was admitted to show the location of the two entrance wounds in Travis's back and buttock. One of the shots into Travis's back went into his spinal cord, while the one in his buttock angled up and went into his liver. State's Exhibit 45 was a close-up of the wound to Travis's back, with a ruler next to it to show size, while State's Exhibit 46 was a close-up of the wound to his buttock, with a ruler next to it. State's Exhibit 47 was a close-up of the wound to Travis's chest, with a ruler next to it.

---

[73] State's Exhibits 53 and 54 are close-up photographs of an entry wound and exit wound on the front of Rachel's torso. Exhibit 53 depicts an entrance wound, with a ruler next to it to show size, and Exhibit 54 depicts an exit wound, with a ruler next to it. Appellant did not challenge the admissibility of these exhibits.

Dolinak also testified about Rachel's injuries. One shot was to her middle-lower chest, and it entered one or two inches from her heart, lungs, and liver. It was close to the spine region. This shot fractured her lower breastbone, then angled right and downward through her diaphragm and liver before it lodged in the right side of her back. Another shot was to Rachel's left upper back. It fractured a rib, passed through her left lung, and then broke another rib before passing out through her upper chest. The third shot entered in the upper part of her left buttock, fractured her pelvic bone, and exited in front, just above her genital area. A fourth wound was to Rachel's right hand. It went into the area between her thumb and index finger and hit the bone at the base of her thumb.

Dolinak used State's Exhibit 51 to locate the entrance and exit wounds on Rachel's chest. He testified that the entrance wound was just above the surgical incision and that the bullet passed through her liver. He identified State's Exhibit 52 as a close-up view of the entrance and exit wounds on Rachel's chest. He identified little red markings around the entrance wound and the somewhat irregular wound shape, which indicated that the bullet that made the wound went through something else before it entered Rachel's chest. Dolinak inferred that this wound was made by the bullet that passed through Rachel's hand before it reached her body. State's Exhibit 53 is another close-up view of that entrance wound, with a ruler next to it to show size. State's Exhibit 54 is a close-up view of the exit wound on her chest, with a ruler next to it. State's Exhibit 56 shows the bullet wound on Rachel's hand. State's Exhibit 57 shows two red circles—entrance wounds—on her back and buttock. The upper wound was caused by the bullet that went through her left lung, and the lower wound

was caused by the bullet that fractured her pelvic bone. Dolinak used State's Exhibit 58, a close-up view of the entrance wound to Rachel's back, to show that her heart and lungs were in the area of that gunshot wound. Any one of Travis's three injuries would have been fatal, and two of the three bullets that hit Rachel caused fatal injuries.

Concerning the autopsy photographs, we note that appellant objected to State's Exhibits 51 and 52 as inflammatory, but he objected to the remaining photographs only on grounds of being duplicative or cumulative. Accordingly, only his trial objections to State's Exhibits 51 and 52 comport with his complaint on appeal that the autopsy photographs should have been excluded because they were inflammatory and highly prejudicial. However, even assuming *arguendo* that appellant's objections at trial were adequate to preserve his current complaint, this point of error is without merit.

In this case, the color photographs taken at the scene showed the victims as they appeared to first responders shortly after appellant shot them, and the autopsy photographs showed the locations and characteristics of their wounds. This evidence provided a picture of the events the State relied upon to show how the victims died and the severity of their injuries.[74]

Appellant's defense was that he lacked the requisite *mens rea* for capital murder, and he presented evidence of his mental illness in support of his defense. He also argued that,

---

[74] *See Sonnier,* 913 S.W.2d at 519 ("[W]hen the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence.").

due to his PTSD and Rachel's statements that her brother had a gun, he felt threatened by Travis. Additionally, he argued that the fact that he used only six of his first magazine of seven bullets and did not use the second magazine that he had brought with him was evidence that he did not intend to kill the victims.

As previously stated, the number and location of the wounds inflicted are probative of a defendant's intent.[75] The State presented a moderate number of photographs to demonstrate the effects of six gunshots on two victims.[76] The photographs of the victims at the scene were presented through the testimony of first responders, who verified that they accurately depicted the victims as they were found at the scene and as emergency responders began lifesaving efforts. The autopsy photographs were first presented through the testimony of the medical examiner, who used them to describe the locations and characteristics of the bullet wounds and the damage that each bullet had caused. These photographs were highly probative to show the full extent of the injuries appellant inflicted on the victims.[77] The fact that the autopsy photographs showed portions of the victims' naked bodies was incidental to providing a clear and accurate view of the gunshot wounds.[78]

State's Exhibits 51 and 52, autopsy photographs of the gunshot wounds to Rachel's

---

[75] *See Motilla,* 78 S.W.3d at 359; *Rojas,* 986 S.W.2d at 250.

[76] *See Gallo,* 239 S.W.3d at 762 (number of exhibits offered is a factor a court may consider in determining whether probative value of photographs is substantially outweighed by danger of unfair prejudice).

[77] *See id.* at 763.

[78] *See Williams v. State,* 301 S.W.3d 675, 693 (Tex. Crim. App. 2009).

chest, also depicted a midline incision that began below her breasts and continued lengthwise to her pelvic region. This incision was stitched closed. The medical examiner identified this incision as a "surgical incision," and an emergency room doctor and a surgeon testified about incisions they made, including this one, during their efforts to save Rachel's life. There was no danger that the jury would attribute this incision to appellant's conduct.[79]

Considering the testimony in this case and the elements that the State had to prove to the jury beyond a reasonable doubt, the trial court did not abuse its discretion in finding that these photographs were relevant and that their probative value was not substantially outweighed by the danger of unfair prejudice. Point of error five is overruled.

In point of error six, appellant asserts that the trial court erred in admitting evidence at the guilt phase that Leah's protective order against appellant was in place at the time of the offense. Although appellant frames this point of error in terms of evidence of the protective order, his argument primarily concerns the admissibility of evidence of his previous conduct toward Leah that precipitated the protective order and whether this evidence was inherently prejudicial. He asserts that the redacted protective order that was admitted into evidence, and references to the protective order that he made in his statement to police, constituted extraneous offense evidence. Appellant contends that this evidence did not show his relationship to the victims of the instant offense and did not show that he had

---

[79] *See, e.g., Rayford v. State,* 125 S.W.3d 521, 531 (Tex. Crim. App. 2003) (no abuse of discretion in admitting photos that were not more gruesome than the crime, and effects of emergency-room intervention could be explained).

previously acted with intent to kill or with knowledge that his conduct would result in death. Thus, appellant argues, evidence of the protective order was not probative of his state of mind because he never argued that he lacked intent to cause harm when he shot the victims, only that he lacked intent to cause, or awareness that his conduct would result in, death.

The parties and court conferred outside the jury's presence about anticipated evidence regarding the protective order. The State asserted that this evidence was relevant under Rule 404(b) to show appellant's intent and motive. The State further asserted that the fact that appellant was banned by the protective order from carrying a gun precluded any self-defense claim or other excuse for appellant's having the weapon with him when he confronted Rachel. The State noted that appellant's conduct toward Leah and Rachel was similar: repeated calling and texting, finding them when they were away from home, and sneaking into their homes to wait for them. This prior bad-act evidence also rebutted the defense's theory that, as a result of appellant's mental illness, he lacked the requisite *mens rea* to commit capital murder. The trial court ruled that the State could introduce the extraneous bad acts and the protective order because appellant's intent and remorse were at issue. The judge reasoned that "[t]he stalking scenario [in that case was] basically the same scenario here," except that appellant "took it to a higher level" in this case.

Appellant objected to this evidence under Rules 404(b) and 403, arguing that the State needed to specify the non-character-conformity exception that applied to it, and that its probative value was outweighed by its inflammatory and prejudicial nature. Appellant also objected that, although some features of the prior scenario were similar, the issue in this case

was whether he intended to commit a capital murder, not whether he intended a criminal trespass or an assault. Appellant argued that the prior bad acts involving Leah had only prejudicial effect, no probative value; they showed that appellant was a bad character, but they did not go to his state of mind when he pulled the trigger in this case. The trial judge overruled appellant's objections and stated that he would give limiting instructions on the extraneous-offense evidence. The court also redacted much of the protective order before admitting it as State's Exhibit 206.

Before the jury, appellant objected when the State asked his mother, Patricia, whether she knew that a young lady had obtained a protective order against appellant in 2007. Appellant referred to his prior objections to State's Exhibit 206 and obtained a running objection. The court gave a limiting instruction, and Patricia affirmed that she was aware of the protective order.[80] On redirect, Patricia stated that she did not know whether appellant

---

[80] State's Exhibit 206, the redacted protective order admitted during Patricia's testimony, indicated in relevant part that Leah had applied for a protective order and that the order provided:

> The Court finds that the parties have agreed in writing to the terms under section 85.021 of the Texas Family Code set out below, and the Court approves that agreement. The Court further finds that the parties have been informed that the agreed order is enforceable civilly or criminally.

> * * *

> The Court finds that the following protective orders are for the safety and welfare and in the best interest of Applicant and other members of the household and are necessary for the prevention of family violence.

> *Orders*
> IT IS ORDERED that Respondent, John Darrell Thuesen, is:

(continued...)

had a gun in his house. She further related that she did not know that he was barred by the protective order from having a gun for two years. She stated that appellant as she knew him could not have intentionally or knowingly killed the victims.

The parties and court had a conference outside the presence of the jury before appellant's statement to police was published through the testimony of Detective Massey. Appellant wanted to redact part of his statement, including a reference to the previous stalking. The trial court ruled that the State could introduce that part without redaction.

In his statement to police, appellant first mentioned Leah when Massey asked him whether he had a girlfriend before Rachel. Appellant stated that his last "real girlfriend" was "the one [he] got in trouble with before" after he kept trying to call her and ask her why she would not talk to him. He acknowledged that he would not leave her alone when she told him to go away. He related that he repeatedly called her and showed up at her house and that he would find her when she was out with friends. He stated that "they" tried to file stalking charges. These events happened around July or August of 2007. Detective Webb asked

---

[80](...continued)
Prohibited from possessing a firearm or ammunition, unless Respondent is a peace officer, as defined by section 1.07 of the Texas Penal Code, actively engaged in employment as a sworn, full-time paid employee of a state agency or political subdivision.

*Effective Period*
This order shall continue in full force and effect until September 4, 2009.

Finally, the "Warnings" section of the order reiterated the ban against possessing a firearm and set forth the range of penalties for violating the order, including a warning that possessing a firearm while the protective order was in effect could result in federal criminal penalties.

appellant about the timing of his gun purchase in May 2007 and whether that purchase was connected to his problems with Leah. Appellant stated that it was not, but he acknowledged that, when that relationship was ending, he had thoughts that were similar to what he was thinking during this incident. Specifically, he stated, "I was tired of being walked on or lied to or something . . . . I didn't want the bullshit."

As a result of his conduct toward Leah, appellant was arrested twice. The first time, he received a criminal-trespass warning for sneaking up to her house and knocking on her window. The second time, he was arrested because he showed up at her house the day after he received the warning. Appellant stated that he was charged with trespassing and public intoxication and that "they" filed a protective order. By then, he had discovered information on Leah's MySpace account about her going out with someone else, so he agreed to leave her alone.

In considering a trial court's ruling on the admissibility of evidence, we must determine whether the trial court abused its discretion.[81] In other words, we must uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case.[82] Finally, we must review the trial court's ruling in light of what was before the trial court at the time the ruling was made.[83]

Evidence of a person's other bad acts is not admissible to prove the character of a

---

[81] *Carrasco v. State,* 154 S.W.3d 127, 129 (Tex. Crim. App. 2005).

[82] *Willover v. State,* 70 S.W.3d 841, 845 (Tex. Crim. App. 2002).

[83] *Id.*

person to show action in conformity therewith, but it may be admissible to establish intent or rebut a defensive theory.[84] If relevant to a non-character-conformity issue, the evidence is still properly excluded under Rule 403 when its probative value is substantially outweighed by the danger of unfair prejudice.[85] The purpose of excluding such evidence is to prevent a jury that has a reasonable doubt of the defendant's guilt in the charged offense from convicting him anyway based solely on his criminal character or because he is generally a bad person.[86]

Appellant now asserts that he never argued at trial that he lacked intent to harm the victims, but the record does not support his assertion. The question of whether appellant intended to harm the victims was raised by the defense's evidence and arguments. In his statement to police, appellant said that he did not intend to hurt the victims. In addition, some of Dr. Saunders's testimony arguably negated appellant's intent with respect to harming the victims. The defense's arguments also focused on appellant's mentally impaired and irrational state. Finally, appellant requested and received jury instructions concerning the lesser-included offenses of murder and manslaughter. A jury could have convicted appellant of murder by finding that he intended to cause serious bodily injury, but a jury could have convicted him of manslaughter only if it found that he lacked the *mens rea* to commit murder

---

[84] Rule 404(b); *Montgomery,* 810 S.W.2d at 387-88; *see also Robbins v. State,* 88 S.W.3d 256, 259 (Tex. Crim. App. 2002).

[85] *See Casey,* 215 S.W.3d at 879-80.

[86] *Garcia v. State,* 201 S.W.3d 695, 703-05 (Tex. Crim. App. 2006).

and that he recklessly caused the victims' death. On the facts of this case, the jury could have found appellant not guilty of any of these offenses only if it found that the State had not proven beyond a reasonable doubt that appellant intentionally or knowingly killed the victims, intentionally harmed the victims, or consciously disregarded a substantial and unjustifiable risk that the victims' deaths would occur.

Appellant's sole defensive theory was that he lacked intent or knowledge with respect to the result of his conduct when he shot the victims. In support of this theory, he offered evidence that he was mentally ill, and that he shot Rachel to keep her from leaving without talking to him, and he shot Travis to stop him from helping Rachel leave. His position was that, due to his mental illness, he was so overwhelmed by the stress of being rejected by his girlfriend that he was unable to appreciate that his conduct of shooting the victims would kill them, not simply stop them.

By placing his intent into issue, appellant opened the door to evidence of other bad acts that established his intent and rebutted his defensive theory. His prior conduct toward Leah when she tried to end their relationship was demanding and intrusive in a manner similar to his conduct toward Rachel after she told him that she needed space. It is at least subject to reasonable disagreement whether the evidence of appellant's conduct toward Leah made his defensive theory less probable.[87]  The trial court, therefore, did not abuse its discretion in admitting this evidence. Point of error six is overruled.

---

[87] *See Bass v. State,* 270 S.W.3d 557, 563 (Tex. Crim. App. 2008).

In point of error eight, appellant asserts that the trial court erred in allowing the State to elicit testimony during its cross-examination of Dr. Saunders that appellant had stalked and choked Leah. On appeal, appellant "incorporates by reference the arguments and authorities for Point of Error Number 6." He asserts that evidence that he acted violently toward a previous girlfriend was not probative of his intent to kill, was not part of any plan or preparation related to the killings, and was not evidence of a motive to cause the victims' deaths. He contends that this evidence "merely tended to show that Appellant was generally violent and would harmfully distract from the issue of his actual mental state."

During its cross-examination of Saunders, the State asked him if he had considered appellant's relationship with Leah, and Saunders acknowledged that he had. Saunders noted that, in the instant offense, appellant was acting consistently with his prior behavior toward Leah. Specifically, appellant pursued Leah, even after she told him not to, in an effort to save the relationship, and he demonstrated a similar level of over-involvement and lack of boundaries. The trial court then gave the jury an extraneous bad-act instruction. The defense objected, under Rule 705(d), that the State was eliciting underlying facts or data that were inadmissible into evidence, but the trial court ruled that the facts were admissible in evidence and that the State could explore the matter. The State pointed to the part of appellant's statement to police in which he acknowledged that he called Leah continuously and that his conduct had been consistent with the charges.

The State also asked Saunders if he was aware that appellant had choked Leah on a prior occasion, and Saunders answered affirmatively. Saunders testified that appellant

blamed this conduct on a startle response. The prosecutor asked Saunders whether the police report regarding the incident with Leah noted that appellant's behavior was "consistent with a deranged person" and that appellant had "propensities for one that could harm another." Saunders acknowledged that he had read such information in the report.

At that point, defense counsel approached the bench and complained that the State had exceeded the scope of cross-examination under Rule 705(d) and was reading from the police report. He argued that the State was offering evidence of future dangerousness, which related to the punishment phase. He also objected that the statements from the police report were offered solely as character evidence, in violation of Rule 404(b), and that the error could not be cured by an instruction to disregard. The judge sustained defense counsel's objection and stated that he would provide an instruction to disregard the last statement of the prosecutor, but he denied counsel's request for a mistrial. Defense counsel then requested a running objection to "everything about Leah Mathis," and the court granted it with respect to the rest of Saunders's testimony.

For the reasons discussed in point of error six, above, appellant's complaint with respect to the stalking and trespassing evidence presented during Saunders's testimony lacks merit. To the extent that appellant complains of the reference to choking Leah, it does not appear from the record that he objected to this particular testimony. Therefore, he failed to preserve error.[88] Point of error eight is overruled.

---

[88] TEX. R. APP. P. 33.1.

In point of error nine, appellant asserts that the trial court erred in denying his motion for mistrial after the State elicited improper character evidence during Saunders's testimony, specifically the notation in a police report that appellant had a propensity to harm others. He also contends that the trial court's instruction to disregard was not sufficient to cure the error. He appears to argue that the harm resulting from the "amount of evidence concerning Appellant's violent character" made it "unlikely that a jury could follow the trial court's instruction to disregard or to consider [the evidence] for only a limited purpose."

As described in point of error eight, above, the question was asked and answered before appellant objected. Therefore, he did not preserve error.[89] Even so, the trial court sustained the objection and gave the jury an instruction to disregard. Instructions to the jury are generally considered sufficient to cure improprieties that occur during trial.[90] The instruction in this case was sufficient to cure any error.

With respect to appellant's complaint that the "amount of evidence" of his "violent character" made it unlikely that the jury could follow the trial court's instructions, we observe that very little evidence of appellant's violent conduct toward Leah was presented at the guilt phase. Moreover, appellant does not direct us to any authority for his position that the "amount of evidence" could have had an adverse effect on the jury's ability to follow

---

[89] *See Luna,* 268 S.W.3d at 604 (if defendant fails to object until after an objectionable question has been asked and answered, and he can show no legitimate reason for the delay, his objection is untimely and any claim of error is forfeited).

[90] *See Gamboa v. State,* 296 S.W.3d 574, 580 (Tex. Crim. App. 2009).

the trial court's instructions. Therefore, this complaint is inadequately briefed and presents nothing for review.[91] Point of error nine is overruled.

In point of error ten, appellant asserts that the trial court erred when it excluded Defendant's Exhibit 15 (the "*Lagrone* order")[92] from evidence at the guilt phase.[93] Appellant complains that the exclusion of the court's pre-trial *Lagrone* order, which provided that the State could conduct its own mental evaluation of appellant, denied him the opportunity to present probative evidence and violated his rights to due process guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. During cross-examination, the prosecutor elicited testimony that Saunders failed to ask appellant during his evaluation what appellant was thinking at the time of the offense, and the prosecutor mentioned this omission again in closing argument. Appellant claims that this left a false impression with the jury that the State did not have an opportunity to conduct its own mental health examination of

---

[91] TEX. R. APP. P. 38.1; *Lucio v. State,* 351 S.W.3d 878, 896 (Tex. Crim. App. 2011). In any event, even if we were to reach it, we would reject appellant's argument on the merits. The "amount of evidence concerning [a]ppellant's violent character" that was admitted at the guilt phase of trial, beyond the reference to his "propensities" in the police report, was not such as to render the trial court's instruction to the jury to disregard that reference inefficacious.

[92] *See Lagrone v. State,* 942 S.W.2d 602, 610 (Tex. Crim. App. 1997) (citing *Soria v. State,* 933 S.W.2d 46, 57-59 (Tex. Crim. App. 1996)) (when the defense plans to introduce testimony based on a psychiatric examination of defendant, the trial court may compel a psychiatric examination by a State's expert, and if the defense introduces expert testimony based on the defense expert's examination, the State may present expert rebuttal testimony).

[93] The record reflects that, after the State rested its case in rebuttal at the guilt phase, appellant requested at the bench that the trial court admit the *Lagrone* order into evidence. The trial court held that this order was inadmissible. Appellant stated that he wanted to make a proffer outside the presence of the jury, but otherwise, the defense rested. Appellant made a bill of exception and re-offered the *Lagrone* order. The trial court again excluded the *Lagrone* order from evidence but included a copy in the record for purposes of appeal.

appellant and present evidence unfavorable to appellant because only the defense expert could evaluate him. Appellant asserts that if the *Lagrone* order had been admitted, he could have argued that the State had an opportunity to have its own expert evaluate appellant, and the fact that the State chose not to examine appellant suggested an inference that such an evaluation would have resulted in evidence favorable to appellant.

In the instant case, the trial judge acted within his discretion by preventing appellant from presenting the *Lagrone* order as evidence that the State had an opportunity to obtain its own expert to conduct a mental evaluation. We fail to comprehend how the prosecutor's question whether Saunders asked appellant what he was thinking at the time of the offense during his examination of appellant could have left the false impression that the State was given no opportunity to conduct its own mental health evaluation of appellant.[94] Nor do we perceive (and appellant does not explain) how the fact that the State *could* have evaluated appellant pursuant to the *Lagrone* order serves to rehabilitate whatever adverse inference the jury might have drawn from the fact that Saunders failed to ask appellant about his state of

---

[94] That the State in fact produced no expert witness of its own at trial to testify about appellant's state of mind during the offense may have left the jury with the impression that the State: 1) had no opportunity to evaluate appellant; 2) had the opportunity to evaluate appellant, but chose not to; 3) had the opportunity to evaluate appellant and did so, but failed to call its expert to testify about that evaluation because it led to evidence favorable to appellant; or 4) had the opportunity to evaluate appellant and did so, obtained an evaluation favorable to the State, but was unable or unwilling to call its expert to the witness stand for reasons that are unknown but in any event unrelated to the results of the evaluation. The jury would not have had any particular basis, however, to prefer one of these theories over the others. While it is certainly true that the prosecutor established that Saunders failed to ask appellant about his state of mind during the offense, adding that circumstance to the mix would not logically cause the jury to prefer one of these theories to the others.

mind. It was well within the trial court's discretion, therefore, to conclude that the *Lagrone* order bore no relation to any fact—either an elemental fact or an evidentiary fact (such as the credibility or reliability of a witness's opinion with respect to an elemental fact)—that is of consequence in the case.[95] The trial court acted well within its discretion to exclude the *Lagrone* order from evidence. Point of error ten is overruled.

In point of error eleven, appellant asserts that the trial court erred when it overruled appellant's objection to the jury charge at the guilt phase for failing to instruct the jury that the State had a right to conduct its own mental health examination of appellant.[96] He complains that the jury charge misleadingly implied that the State could not have conducted its own mental evaluation of appellant by instructing the jury: 1) that the law does not require a defendant to produce evidence; and 2) that the jury may not draw any adverse inference from a defendant's failure to testify. Appellant does not elaborate on how these instructions operated to create the mistaken impression that the State was prevented from conducting its own expert evaluation of appellant's mental health.

The trial court must give the jury a written charge "setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the

---

[95] Tex. R. Evid. 401.

[96] At the guilt-phase charge conference, the trial court denied appellant's proffered "*Lagrone* instruction," but stated that the prosecutor would open the door to such an instruction if he argued in closing that Saunders never asked appellant what he was thinking because he knew that the answer would not be favorable to the defense. Appellant argued that the State had already opened the door by questioning Saunders about his failure to ask appellant what he was thinking at the time of the offense. Appellant offered his proposed instruction, and the trial court declined to give it.

testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury."[97] As with any criminal defendant, appellant had a Fifth Amendment privilege not to testify against himself,[98] and appellant's jury was instructed accordingly. This Fifth Amendment privilege against self-incrimination extends beyond the courtroom itself to cover pre-trial expert evaluations as well.[99] A defendant's Fifth Amendment privilege not to submit to evaluation by a State's expert, we have held, is subject to waiver: A defendant who submits to evaluation by his own expert waives his Fifth Amendment privilege with respect to the subject matter of that evaluation if his own expert later testifies.[100] Admissibility of testimony from the defendant's expert may be made contingent on the defendant's first having submitted to an evaluation by a State's expert, who may testify at trial about whatever subject matter the defendant's own expert witness first testifies to.[101] Appellant's argument seems to be that the trial court's instruction with respect to burden of proof and the privilege against self-incrimination would have informed the jury of the privilege he had not to submit to an evaluation by a State's expert, but not about the possibility that (as in this case) he might have effectively waived that privilege. Appellant seems to assert that, because here he did waive the privilege, the law providing for waiver

---

[97] *Celis v. State,* 416 S.W.3d 419, 433 (Tex. Crim. App. 2013) (quoting Article 36.14).

[98] U. S. CONST. amend. V.

[99] *Estelle v. Smith*, 451 U.S. 359, 466-68 (1981).

[100] *Lagrone*, 942 S.W.2d at 610-11.

[101] *Id*. at 611-12.

of the privilege became "law of the case" that must be submitted to the jury under Article 36.14.

But appellant's jury was never explicitly told that the Fifth Amendment privilege extends to pretrial expert evaluations. Appellant's argument takes for granted that his jury was aware of the full scope of the privilege and therefore needed to be made aware that the privilege could be, and in fact was, waived in this case when Saunders testified. But if we are to indulge appellant's presumption that appellant's jury knew, without having to be told, that the appellant's privilege against self-incrimination would extend to a pretrial State's evaluation, why would we not likewise indulge the presumption that the jury also knew, without having to be told, that the privilege could be waived if appellant first submitted to an evaluation by his own expert? Rather than entertain either of these dubious presumptions, we conclude that the trial court's instructions with respect to burden of proof and the privilege against self-incrimination simply did not create a mistaken impression that the State was not given the opportunity to evaluate appellant.

An instruction in the jury charge to the effect that the State had a right to conduct its own mental health evaluation of appellant would have focused the jury's attention improperly on a collateral issue and invited the jury to speculate about evidence that was not before it.[102] The trial court did not err in refusing to give such an instruction. Point of error eleven is

---

[102] *See Estrada,* 313 S.W.3d at 312 (trial court did not err by refusing to instruct jury that the mere fact that appellant had committed a capital offense was insufficient in itself to warrant a finding of future dangerousness).

overruled.

In point of error fourteen, appellant asserts that the trial court erred when it granted the State's motion *in limine* that prevented defense counsel from arguing that the State had a right to have its own mental health examination of appellant. He complains that he should have been allowed to argue to the jury that the State could have had its own expert examine appellant in order to dispel the suggestion by the State that appellant's mental health evidence was somehow withheld or manipulated.

During the charge conference, the State moved *in limine* to prevent defense counsel from arguing to the jury that the State could have retained a psychologist to "speak with" appellant but failed to do that. The State clarified that it was not challenging whether the defense could argue that the State did not present its own expert, but that it did not believe that the defense could argue specifically that the State had access to appellant but failed to obtain its own expert evaluation or testing. The State argued that its access to appellant under the pretrial *Lagrone* order was a peripheral issue. The State asserted that, even with the proposed limitation, the defense could still argue that the State never called an expert to rebut the defense expert.

Defense counsel countered that the State would be able to create a false impression that the defense could not correct, because the prosecutor planned to persuade the jury that the defense was hiding something by arguing that the defense expert failed to ask appellant certain questions, when in fact the State could have hired its own expert to ask those

questions.[103] Defense counsel objected that the limitation would violate appellant's rights to due process and effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments and his right to be free from cruel and unusual punishment under the Eighth Amendment.

The trial judge observed that it was generally permissible to draw an inference from a witness's absence when that witness would normally be expected to testify, and he deferred ruling on the State's motion *in limine* until the next day. The following morning, he continued:

> The law and argument is that if a witness is not called that is identified with either side, the other side can comment on the failure to call that witness. . . .
>
> For instance, if there were a witness identified with a victim that saw some of this happen at the residence and the State didn't call that witness, that would be fair game.
>
> However, in this case we're talking about an expert that was never hired, is not identified, and did not do anything, does not exist, which I believe would be outside the record of this case. Therefore, I am going to require the attorneys to stick to what is in the evidence for their final argument and the reasonable deductions therefrom, and I am going to bar any comment on the State's failure to hire and call an expert witness and ask questions through that witness of the defendant.[104]
>
> I believe that would be a perilous door to open because a comment by the Defense in argument would invite a reply from the State.

---

[103]  But *see* note 94, *ante.*

[104]  The State notes in its brief that a trial judge's grant or denial of a motion *in limine* normally preserves nothing for appellate review. *See Geuder v. State,* 115 S.W.3d 11, 14-15 (Tex. Crim. App. 2003). In this case however, the trial judge made a specific adverse ruling that the defense was barred from commenting on the State's failure to hire an expert to evaluate appellant. *See id.* at 14.

Then you get into the danger of whether that reply oversteps the bounds, and I can see this thing spiraling out of control and comments on the Fifth Amendment right to remain silent being made or invited, neither of which would be good.

So I am going to require that the attorneys stick within the record and the reasonable deductions therefrom.

That is my ruling on the limine by the State that was brought to us last night.

The trial court added that the defense could still argue that the State never called any expert to testify about appellant's mental condition.

A party is generally allowed to comment on an opposing party's failure to call a witness who would be expected to testify.[105] "A party may always comment on the fact that the opponent failed to call an available witness and then argue 'Don't you know, if Mr. X had anything favorable to say, my opponent would have called him.'"[106] On the other hand, a party is generally prevented from creating a witness and speculating about what he would say.[107]

---

[105] *See, e.g., Mosley v. State,* 686 S.W.2d 180, 182-84 (Tex. Crim. App. 1985) (prosecutor may comment on defendant's failure to call any witnesses at all or some particular known witness who is competent to give material testimony on the matter of defendant's reputation); *Lyles v. State,* 582 S.W.2d 138, 143 (Tex. Crim. App. 1979) (permissible to comment that defendant did not call a known, available witness who was present when defendant was arrested).

[106] *Pope v. State,* 207 S.W.3d 352, 365 (Tex. Crim. App. 2006); *see also Fisher v. State,* 511 S.W.2d 506, 507-08 (Tex. Crim. App. 1974) (prosecutor may not relate his version of the missing witness's testimony, but his argument may include an inference that the testimony would have been material and damaging).

[107] *See McKenzie v. State,* 617 S.W.2d 211, 220-21 (Tex. Crim. App. 1981) (without evidence that defendant had gone to college or attended a local church, prosecutor should not
(continued...)

We reject appellant's position that the State's cross-examination of Saunders left the impression that appellant's mental health evidence was somehow withheld or manipulated. Further, appellant was allowed to argue that the State would have called an expert to testify about appellant's mental condition if the State had seriously disputed Saunders's opinion. This permitted jury argument was very similar to the argument that appellant was prevented from making. We decline to find reversible error when a trial court sustains an objection to defendant's jury argument but later allows a similar argument.[108] Point of error fourteen is overruled.

In point of error twelve, appellant asserts that the trial court erred when it refused to include a written instruction in the guilt-phase jury charge regarding Dr. Carlo, the psychiatrist who treated appellant at the VA hospital over Labor Day weekend of 2007. Appellant wanted the jury instructed that he could not ask Carlo certain questions because federal regulations prevented him from testifying about any matter for which he did not treat appellant. Although the trial court orally explained this to the jury during Carlo's testimony, it declined to give a written instruction to this effect. Appellant complains that the oral instruction was insufficient and that it did not explain that the federal government, rather than the trial court, placed the limitation on Carlo's testimony. Appellant claims that the jury

---

[107](...continued)
have speculated about defendant's failure to call an old college classmate or a minister from church, and the things that such witnesses should be expected to say, as if they actually existed).

[108] *See, e.g., Davis,* 329 S.W.3d at 825.

could have mistakenly concluded that appellant did not ask Carlo whether, in his opinion, appellant suffered from PTSD because he feared the answer would be harmful to the defense, or that Carlo was not competent to testify about the matter. Thus, appellant contends, he was deprived of due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

The court and parties discussed the limitations on Carlo's testimony and how to address them on several occasions throughout the trial. Initially, during a conference outside the jury's presence, defense counsel stated that a federal regulation prevented a federal employee from being subpoenaed as an expert witness in a matter not involving the United States as a party. However, defense counsel explained that he was not calling Carlo as an expert witness but as a treating physician, to establish his care and diagnosis of appellant.

In a later conference at which an Assistant United States Attorney ("AUSA") and Carlo were present, the AUSA explained that the VA had authorized Carlo to testify in accordance with federal regulations so long as his testimony was limited to the contents of appellant's medical records and was not opinion or expert testimony.[109] The AUSA clarified that any opinions that were documented in the medical records were available, but opinions

---

[109] Pursuant to its authority under 5 U.S.C. § 301, the VA has promulgated regulations restricting the circumstances in which VA employees may be called to testify and the scope of their testimony in matters that do not involve the federal government as a party. *See* 38 C.F.R. § 14.800 *et seq.*; *see also U.S. ex rel. Touhy v. Ragen,* 340 U.S. 462, 469 (1951); *Alexander v. State,* 450 S.W.2d 70, 71-72 (Tex. Crim. App. 1970). Specifically, a VA employee may provide testimony or produce VA records in legal proceedings covered by Sections 14.800 through 14.810 only as authorized in accordance with the regulations and only as authorized by a determining official. *See* 38 C.F.R. § 14.803. Such testimony or records must be sought through the process provided in the regulations. *See* 38 C.F.R. §§ 14.800 & 14.806.

that went outside those records were not.

Later, defense counsel stated that the AUSA had approved a list of questions that counsel had provided to her. Counsel requested an instruction to inform the jurors that the AUSA was legal counsel for the VA and that under federal law, Carlo could testify only within certain parameters. The State objected that such an instruction would be a comment on the weight of the evidence, but the trial judge responded that the jurors needed to know that the witness could only testify within certain parameters.

When Carlo was called to testify before the jury, the trial court instructed the jurors that Carlo was from the VA, the person sitting next to him was legal counsel for the VA, and she was required to accompany him during his testimony. Carlo then testified that he handled appellant's emergency admission to the VA hospital on August 29, 2008, after appellant called the Suicide Hotline to report that he was thinking about killing himself. Carlo's impression of appellant was that he was "incredibly, severely depressed." Although Carlo treated thousands of patients, the intensity of appellant's depression stood out to him. At one point while he was interviewing appellant, Carlo was so affected by appellant's depression that he had to leave the room and pull himself together before he could continue working with appellant. "When you're interviewing a patient like this, you feel that it is sort of sucking the life out of you." He stated that appellant's depression warranted an independent diagnosis of "major depressive disorder." Carlo explained that this illness is a chronic illness that can be treated and improved but not cured, and it requires lifelong treatment.

Carlo testified that appellant complained during the intake interview that he was depressed about a break-up that had happened six months earlier. Appellant stated that he did not trust women and had no interest in them. He also complained about financial issues and school-related stress. He denied having flashbacks. Carlo gave appellant an anti-depressant, and appellant spent the weekend at the VA hospital. Appellant's condition was somewhat improved, but far from resolved, when appellant requested to be discharged the following Tuesday.

Before appellant was discharged, he told Carlo that he was no longer considering killing himself and seemed to be making plans for the future. He wanted to leave the hospital because he did not want to risk losing his job or falling behind in school. Appellant was designated as a "high-risk patient," but his reasons for wanting to leave were rational and he did not appear to be a danger to himself or others. Appellant told Carlo that he would leave his gun at his parents' house for safekeeping. Carlo discharged appellant with instructions to participate in a follow-up plan, including taking anti-depressant medication as prescribed and meeting regularly with a VA counselor in College Station, and appellant seemed interested in continuing treatment. When Carlo heard about the offense, he was very sad. Carlo stated that the year had been difficult because he had "lost a lot of kids" and his thought was that he had just lost another one.

The prosecutor asked Carlo whether he noted in appellant's record "PTSD symptoms" and "patient denies any traumatic events." Carlo acknowledged that he did, but he added, "that does not really have a lot of meaning in the initial interview for initial evaluation."

Outside of the jury's hearing, defense counsel objected that the State was leaving a false impression that appellant had not had any traumatic experiences, and that the defense could not correct this impression by asking Carlo whether he believed that appellant had PTSD because of the federally mandated limitation on questioning. Defense counsel stated that in order to correct the false impression, the defense needed to ask Carlo whether, in his opinion, appellant has PTSD. The AUSA stated that, although counsel could not ask an open-ended and general question that was not narrowed to the time of treatment, defense counsel could ask the question as it related to the time that Carlo saw appellant. Counsel declined to do so. In the discussions that followed, the AUSA again reminded defense counsel that he could ask Carlo whether in his opinion appellant suffered from PTSD at the time he saw him, but counsel again rejected that option.

After a break, defense counsel stated that he would proceed with a line of questions that he had discussed with the AUSA. The trial judge then indicated his understanding that defense counsel was withdrawing the prior objections without a ruling from the trial court. Counsel did not contradict this understanding. Defense counsel requested that the trial court read the VA's authorization to the jury so that jurors would be aware that Carlo's testimony was limited by federal law. Before bringing the jury back, the court read the VA's authorization to the parties. Both parties indicated that they had no further requests or objections.

When the jury returned, the trial court stated:

Ladies and gentlemen, I need to give you an instruction at this time. Please

listen very carefully to the instruction.

> Dr. Carlo's testimony is limited to fact testimony based on the medical records and Dr. Carlo's personal memory of facts relating to the treatment of Veteran John Thuesen, and this authorization does not extend to any opinion testimony which Dr. Carlo may be qualified to provide.

> That is the end of the instruction. Let's proceed with the questioning.

The prosecutor then asked Carlo whether appellant denied any previous assaultive behavior. Carlo confirmed that this denial was documented on appellant's chart. On redirect, Carlo explained that "most of the time patients don't speak out completely" during the initial interview, because "in psychiatry you are ta[l]king about feelings, emotions, and information that sometimes is not so easy to talk about." The information collected in the initial interview is used to establish a treatment plan and "working diagnosis," which may change, based on information that is discovered later as the doctor and patient establish a relationship. Thus, appellant's report of "no traumatic events" might not be accurate. Marines, more than servicemen in most other branches of the military, are trained not to complain and not to have emotions, but instead to have "emotional numbness."

At the charge conference, defense counsel stated that the oral instruction given when Carlo testified was insufficient. Counsel proposed giving a different instruction in the written jury charge:

> Dr. Ismael Carlo testified in this cause. His employer, the United States government, refused to allow him to testify as to his opinion concerning whether John Thuesen was suffering from posttraumatic stress syndrome or whether John Thuesen's mental condition was such that he didn't knowingly or intentionally cause the death of Rachel Joiner or Travis Joiner.

The fact that he was prevented from this testimony [sic] may be considered by you during your deliberations.

The court declined to give this instruction. Defense counsel then requested "a curative instruction generally in that regard so the jury will know that the Defense was prevented from asking opinion questions of Dr. Carlo." The State responded that the court had already given an instruction, so anything further was "just a comment on it." The trial judge stated that he would not give any instruction on Carlo. Defense counsel then requested that the court provide the same instruction that was provided orally during Carlo's testimony. The State again responded that such an instruction would be a comment on the weight of the evidence and that giving the instruction in the written jury charge would call attention to a specific witness's testimony. The trial court declined to give this alternative requested instruction.

The trial court did not err by refusing appellant's proposed written instructions. Defense counsel expressly requested the oral instruction in the precise language that the trial court provided to the jury. Thus, appellant may not complain on appeal about the content of that instruction.[110] Regarding the requests for written instructions in the jury charge, any such instruction would have constituted an improper comment on the weight of Carlo's testimony.[111] The language contained in both of appellant's proposed instructions also

---

[110] *See, e.g., Druery,* 225 S.W.3d at 505-06 (a party who affirmatively seeks action by the trial court cannot later contend that the action was error).

[111] *See Bartlett v. State,* 270 S.W.3d 147, 152 (Tex. Crim. App. 2008) (trial court improperly comments on the weight of evidence by singling out evidence in its general instructions to the jury).

invited the jury to speculate about evidence that was not before it.[112]

Further, appellant's assertion that he was prevented from asking Carlo whether he believed that appellant suffered from PTSD misrepresents the record. The AUSA informed defense counsel on several occasions that counsel could ask Carlo whether he believed that appellant suffered from PTSD at the time Carlo interviewed him. Defense counsel repeatedly declined to do so. In addition, even though appellant did not ask Carlo directly whether he believed appellant suffered from PTSD, he elicited essentially the same information through other questions. Carlo testified that appellant's records included a notation of "PTSD symptoms" and that appellant admitted to nightmares and feelings of worthlessness. He stated that appellant's presentation was typical of "these kids that are coming from the war, that the symptoms are very common across the board in all of them. . . . We don't always get it on the first interview, but we always explore that with everybody." Contrary to appellant's assertions, the record does not reflect that the jurors were left with a false impression concerning the source of the restriction on Carlo's testimony, appellant's mental condition, or Carlo's competence to testify about appellant's mental condition. Point of error twelve is overruled.

In point of error thirteen, appellant asserts that the trial court erred when it overruled his objection to the charge at the guilt phase on grounds that it improperly instructed jurors

---

[112] *See, e.g., Wesbrook v. State,* 29 S.W.3d 103 115 (Tex. Crim. App. 2000) (in jury argument, it is improper to invite the jury to speculate on the existence of evidence not presented).

that they could consider evidence of extraneous bad acts for the purpose of showing appellant's intent, motive, plan, preparation, or rebuttal of a defensive theory. Appellant states that the evidence of the protective order's prohibition on possessing a firearm was not relevant for these purposes, and the instruction was an improper comment on the weight of the evidence. He "incorporates by reference his argument and authorities contained in Points of Error Numbers 6 and 8." He reiterates that the extraneous offenses had no bearing on the purposes listed in the charge and argues that suggesting otherwise to the jury constituted an improper comment on the evidence.

For the reasons stated in points of error six and eight, above, the trial court did not abuse its discretion by finding that the extraneous bad act evidence, although not admissible for purposes of showing character conformity, was admissible to show appellant's intent and to rebut the defense's theory. Accordingly, the trial court properly provided a limiting instruction with respect to this evidence. Point of error thirteen is overruled.

## PUNISHMENT PHASE

In points of error fifteen and seventeen, appellant asserts that the trial court erred at the punishment phase by admitting victim-character, -background, and -impact testimony from persons other than immediate family members. He specifically complains that testimony from the victims' paternal aunt, Wally Joiner Leaverton, and Rachel's high school track coach, Kitty Gibson was inadmissible because its probative value was substantially

outweighed by its potential for unfair prejudice.[113]

The record shows that before the jury was brought in for the punishment phase, appellant objected to any witnesses except for immediate family members being allowed to testify about victim-character and -impact evidence. He noted that the State had already offered victim-character evidence at the guilt phase, and he argued that this evidence encouraged the jury to find that the victims' lives were worth more than the defendant's life and discouraged it from properly considering the issues of appellant's future dangerousness and the mitigating evidence. The State argued that the evidence at the guilt phase was not victim-character evidence but victim-background evidence, which was admissible at the guilt phase to put a face on the victims. At punishment, victim-character and -impact evidence was particularly relevant to the special issues. Defense counsel expressed concern about establishing the limits of such testimony, and the State made a proffer of its witnesses.

The State indicated in its proffer that Leaverton would testify about her knowledge of the victims and the impact that their deaths had on her, the victims' parents, and their brother Evan. Gibson, who traveled to track meets with Rachel and stayed in close touch with her after Gibson moved to another school, would testify to Rachel's character as well as the impact of the offense. Shirley Joiner, the victims' mother, would also testify.

After this proffer, the judge overruled appellant's objection and stated that he would permit those witnesses to testify. Defense counsel then stated that he wanted to make a more

---

[113] TEX. R. EVID. 403.

specific objection to preserve the record. He asserted that there was nothing in this case that justified allowing victim-related testimony from friends and distant family members. He objected that Leaverton and Gibson did not need to testify because close family members were available. He pointed out that the defense had not said anything to question the victims' worth or to suggest that they did not deserve full respect and dignity. He added that the State had estimated that the victim-related testimony would take around two hours, and he asserted that that length of time was excessive; twenty to thirty minutes should be enough. Finally, he expressed concern that this testimony would violate Rule 403 because its appeal to raw emotion might outweigh its probative value for purposes of determining proper punishment. The prosecutor clarified that his two-hour estimate included anticipated cross-examination time, and the witnesses' testimony on direct examination should take closer to an hour. The defense again objected, stating that an hour was still excessive. The court recessed to review relevant case law, then again overruled the defense's objections.

Defense counsel then requested a limiting instruction to the effect that victim-impact evidence could be considered only for purposes of answering the mitigation special issue, not for the future dangerousness special issue. The court declined to give that instruction. Defense counsel requested that the court impose a time limit for the presentation of direct testimony about victim-character and -impact. The court declined to impose a time limit, but stated, "I am going to sit here and listen and see how it goes." The defense requested a running objection, and the court granted it.

Leaverton testified before the jury about her place in the victims' family structure.

She was the younger sister of the victims' father, Wayne Joiner. She had four children, all of whom were younger than Travis. The family was very close, and Leaverton saw the Joiner family often while their children were growing up. Travis was very kind to her children when they would visit, and they loved to play with him. Travis would let them play with his toys and with his LEGO creations, and he did not mind if they broke them. He loved tractors and farm trucks when he was little, but he moved on to telescopes after he saw the movie *Star Wars*. His interest in exploring space continued into college. He was very close to his little brother, Evan, and encouraged him. Rachel was the middle child. Travis was brilliant, and Rachel was very smart as well as graceful and athletic. Rachel loved and cared for her many cats as well as the animals on the farm. When Leaverton's husband gave her the news that Travis and Rachel had been murdered, she drove to Eldorado the same night. Leaverton stated that the victims' parents were still devastated by their children's deaths.

When the prosecutor called Gibson to testify, defense counsel asked to approach the bench. Outside the jury's hearing, defense counsel argued that, if appellant was not aware of a specific characteristic of the victim, then evidence of that characteristic could not be offered to show future dangerousness. The prosecutor responded that Rachel and appellant had been dating for six months, and appellant had indicated that they intended to marry. The defense argued that the jury should be instructed to consider evidence of the victims' characters of which appellant was unaware for mitigation purposes only. The trial judge stated that he would not give any instruction concerning evidence of Rachel's character because of the understanding that appellant was planning to marry her. Later, the judge

stated that he would not give a limiting instruction regarding Travis because appellant knew Travis, even if he did not know him as well as he knew Rachel.

Gibson then testified before the jury that she was Rachel's high-school track coach for two years. Rachel always won at the district level, and they would go on to a regional qualifier meet and then to the State qualifier meet. Rachel was the only girl who qualified for the state qualifier meet, so she and Rachel would travel together by car. Rachel always invited the same friend to join them when they went on overnight trips. Gibson was only twenty-four years old then, and they had a lot of time to get to know each other as friends during their travels.

Rachel was hard-headed and very competitive but also kind. At the time of trial, Rachel was still "the regional record holder in 2-A high jump for our region." Rachel wanted to prove herself in everything she did, not just athletics. She was adventurous and wanted to explore the world. When they went to the Texas Relays competition, Rachel called Travis to tell him how she did before she called her parents. Rachel was not one to brag, but she liked to tell Travis about her accomplishments and make him proud. Gibson moved to another school before Rachel's senior year of high school, but they stayed in touch and would visit with each other whenever they were in the same town. Gibson continued attending track meets to watch Rachel compete. They went together to a ball game in Dallas while Rachel was attending TCU. After they left the game, Rachel remembered that she had some cookies in her car for Gibson and her kids, and she ran from her car to Gibson's car to deliver them.

The State asked Gibson how she felt when she heard about Rachel's death. Defense

counsel objected under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; Article I, Sections 1, 3, 10, 13, 19, and 29, of the Texas Constitution; and Rules 401 and 403. The court overruled the objections. Gibson testified that Rachel's death had a "very big" impact on her life by helping Gibson understand her role with her athletes. Her experience with Rachel made her a better person and a better teacher. She became more conscious of her efforts to reach her students. Gibson stated that she made a point to keep up with her students after they leave school and to help them understand that they have a huge impact on the people around them.

There is no constitutional impediment to the consideration of victim-related evidence.[114] Giving the defendant the broadest latitude to introduce relevant mitigating evidence justly entails permitting the prosecutor to introduce the human costs of the crime of which the defendant stands convicted.[115] Both victim-impact and victim-character evidence are admissible in the context of the mitigation special issue to show the uniqueness of the victim, the harm caused by the defendant, and as rebuttal to the defendant's mitigating evidence.[116]

Victim-impact and victim-character testimony is not limited to immediate family members; distantly related family members, close friends, or co-workers may, in a given

---

[114] *Williams v. State,* 273 S.W.3d 200, 225 (Tex. Crim. App. 2008).

[115] *Id.* at 218-19 (citing *Payne v. Tennessee,* 501 U.S. 808, 827 (1991)).

[116] *Mosley,* 983 S.W.2d at 262.

case, provide legitimate testimony.[117]  However, victim-impact and -character evidence may become unfairly prejudicial through "sheer volume."[118]  The admissibility of such testimony will depend on the closeness of the personal relationship involved, the nature of the testimony, and the availability of other witnesses to provide victim-related testimony.[119] Trial courts should exercise their sound discretion to place appropriate limits upon the amount, scope, kind, and source of victim-impact and -character evidence.[120]

In *Mosley,* we recognized that the State could, within limits, introduce victim-impact evidence of which the defendant was not aware.  These limitations do not apply when the defendant was aware at the time of the offense of the victim's character or of the impact that the victim's death would have on others, because then such evidence is necessarily relevant to the defendant's future dangerousness and moral culpability.[121]  Nevertheless, even in cases in which the defendant knew the victim, the limiting principles we expressed in *Mosley* may still assist a Rule 403 analysis of victim-related evidence.[122]

A fact finder may reasonably conclude that the defendant was aware of the impact that

---

[117]  *See id.*

[118]  *See id.* at 263.

[119]  *Id.* at 262.

[120]  *Id.* at 262-63.

[121]  *See Roberts v. State,* 220 S.W.3d. 521, 532 (Tex. Crim. App. 2007); *see also Williams,* 273 S.W.3d at 216.

[122]  *See, e.g., Estrada,* 313 S.W.3d at 313-16 (applying limiting principles of *Mosley* to determine admissibility of victim-impact evidence in case in which the defendant knew his victim).

the crime would have on the victim's close family members when he knew the victim well.[123]

When he knows the victim, it may be inferred that he is aware of the victim's character or of the relationships the victim has with others, and so evidence of the victim's character and relationships shows that the defendant is the kind of person who would kill someone of that character or with that particular network of relationships.[124]

In this case, appellant and Rachel had been romantically involved for about six months. During that time, appellant had frequently visited Rachel's house, where she lived with her brother, Travis. Appellant interacted with Travis, and he met at least one of Travis's friends. Further, appellant spent time with the victims and their family at the Joiner family's home. The fact finder reasonably could conclude that, at the time of the offense, appellant was aware of the victims' characters and of the relationships that they had with others. Thus, victim-character and victim-impact evidence was highly probative of both the mitigation and future dangerousness special issues.

Leaverton's and Gibson's testimony was at times emotional and moving, but it did not have the potential to impress the jury in an irrational but indelible way.[125] Their testimony

---

[123] *See, e.g., Roberts,* 220 S.W.3d 521, 531-32; *Jackson v. State,* 33 S.W.3d 828, 833-34 (Tex. Crim. App. 2000).

[124] *Williams,* 273 S.W.3d at 220.

[125] *See, e.g., Solomon,* 49 S.W.3d at 366 (victim-impact evidence that humanized victim's family members properly impressed upon the jury that real people were harmed by victim's death; evidence had little potential to impress the jury in an irrational but indelible way because it did not encourage the jury to measure the worth of the victim compared to other members of society).

informing the jury of the victims' characters, and the impact of their deaths on their friends and family, was highly probative of the special issues because appellant knew the victims.

Appellant claims that some victim-character and victim-background evidence came in at the guilt phase through the testimony of the victims' father, Wayne Joiner, Travis's friend, Douglas Perry, and Rachel's friend, Johnny Matthys. At the punishment phase, however, only Leaverton and Gibson testified as victim-character and victim-impact witnesses in the State's case-in-chief, and only the victims' mother, Shirley, testified in the State's case-in-rebuttal. Thus, in total, six witnesses provided victim-related information about two victims.

As we discussed in point of error two, above, most of Wayne's victim-background testimony during the guilt portion of trial was admissible background evidence that established the framework and context of the offense. Perry's and Matthys's testimony primarily concerned the circumstances of the offense. Their testimony contained little information that reasonably could be characterized as victim-character and impact evidence. Shirley did not testify until after appellant had presented numerous witnesses who testified about appellant's own background and character. Shirley's victim-impact testimony occupies only about four pages of the punishment-phase record, which contains over 500 pages.

In these circumstances, the trial court did not abuse its discretion by determining that Leaverton's and Gibson's probative victim-character and -impact evidence testimony was not unfairly prejudicial. Points of error fifteen and seventeen are overruled.

In points of error sixteen and eighteen, appellant asserts that the trial court erred in

denying his request for a limiting instruction at the punishment phase concerning the use of victim-background, -character, and -impact testimony. Appellant states that he should have received a requested instruction that victim-related evidence could not be used to show that appellant would be a future danger or to compare the worth of the victims' lives with appellant's life. He also asserts that the trial court erred in refusing to instruct the jury that it could not consider evidence of Travis's background, character, and relationships in answering the future dangerousness special issue, because he did not know Travis well. Similarly, he argues that the jury should have been instructed that, in answering the future dangerousness issue, it could not consider any information about the victims that was not actually known to appellant.

As discussed in point of error fifteen, above, victim-character and -impact evidence was properly considered in determining both the future dangerousness and mitigation special issues because appellant knew his victims. Appellant cites no legal authority for his argument that he was entitled to a jury instruction limiting consideration of evidence of the victims' characters and backgrounds to information that he actually knew, for purposes of the future dangerousness issue. Such an instruction would be inconsistent with our observation, in *Jackson v. State*, that victim-impact evidence is relevant to the future dangerousness determination so long as it could have been "reasonably foreseen" by the defendant by virtue of the fact that he knew his victim.[126] A jury instruction that

---

[126] *Jackson*, 33 S.W.3d at 833.

consideration of information about which appellant "actually knew" might inappropriately prohibit the jury from considering "the impact that the victims' deaths would have on others" that appellant might reasonably have foreseen.[127]

Appellant also does not cite any authority for his assertion that he was entitled to a jury instruction to the effect that jurors could not use victim-related evidence to compare the victims' worth to his own. And indeed, in *Jackson*, we characterized the argument that "a prosecutor may not compare the worth of a victim to a defendant's worth" as "incorrect."[128] Further, there is nothing in the record to suggest that the jury considered victim-impact evidence for a purpose prohibited by *Payne* and *Mosley*.[129] Points of error sixteen and eighteen are overruled.

In point of error nineteen, appellant asserts that the trial court erred by denying his motion for mistrial after the State elicited testimony violating appellant's right to remain silent. Specifically, he complains of an exchange that occurred during the recross-examination of defense witness Kathryn Wright, in which the prosecutor asked: "The only person who would really know about what happened at the scene are the people that talked to John. Is that right?" Wright responded, "I believe the only person that would truly know

---

[127] *Id*.

[128] *Jackson,* 33 S.W.3d at 834 (citing *Payne,* 501 U.S. at 823, and explaining that *Payne* discourages measuring the worth of the victim against the worth of *other members of society*—it says nothing about the propriety of comparing the worth of the victim to the worth of the defendant).

[129] *See id.*

what happened would be Mr. Thuesen."

Neither the trial judge nor the prosecutor may comment on the defendant's failure to testify, and any such comment violates the Fifth Amendment privilege against self-incrimination.[130]  However, it is not sufficient that the language might be construed as an implied or indirect allusion to a defendant's failure to testify.[131]  The prosecutor may comment upon the testimony and evidence actually presented during the guilt stage, and such a comment is not construed as a comment on the defendant's choice to remain silent during the punishment stage.[132]  In considering whether the language used was manifestly intended or was of such a character that the jury would necessarily and naturally take it as a comment on the defendant's failure to testify, courts must analyze the context in which the comment was made, including the timing of the comment.[133]  If some other explanation for the prosecutor's remark is equally plausible, we will not find that the prosecutor manifestly intended to comment on the defendant's failure to testify.[134]

Further, a trial judge's instructions to disregard are generally considered sufficient to cure an impropriety in jury argument or witness testimony because it is presumed that the

---

[130] *Cruz v. State,* 225 S.W.3d 546, 548 (Tex. Crim. App. 2007).

[131] *Id.*; *see also Wolfe v. State,* 917 S.W.2d 270, 279 (Tex. Crim. App. 1996).

[132] *Randolph v. State,* 353 S.W.3d 887, 894 (Tex. Crim. App. 2011).

[133] *See Cruz,* 225 S.W.3d at 548; *see also Bustamante v. State,* 48 S.W.3d 761, 765, 767 (Tex. Crim. App. 2001).

[134] *See Randolph,* 353 S.W.3d at 891.

jury will follow the instructions.[135] Finally, a trial judge's denial of a motion for mistrial is reviewed under an abuse of discretion standard, and the ruling must be upheld if it was within the zone of reasonable disagreement.[136]

During his case-in-chief at punishment, appellant called Wright, a sergeant in charge of the staff of the medical division with the Brazos County Sheriff's Office, to testify about appellant's good behavior during the time that she and her staff had been treating him at the jail. She testified that appellant had been respectful, calm, and compliant with his medications and that he did well in the structured environment.

On cross-examination, the State sought to emphasize that Wright did not know what kind of person appellant was and that she did not even know the facts of the offense. The complained-of exchange occurred when the prosecutor asked Wright whether the people who talked to appellant would know what happened, and Wright responded that she believed that appellant was the only person who truly knew what happened. Appellant objected that this was a comment on his failure to testify. The prosecutor stated that he would withdraw the question because "that wasn't what I was getting at" and the witness had not answered in the way he intended. The trial court sustained the objection. Appellant then requested an instruction to disregard, and the trial court stated: "Ladies and gentlemen, you are instructed to disregard the last statement of the prosecutor." The prosecutor responded, "Judge, it

---

[135] *See Gardner v. State,* 730 S.W.2d 675, 696 (Tex. Crim. App. 1987); *see also Coble,* 330 S.W.3d at 292.

[136] *Coble,* 330 S.W.3d at 292.

wasn't my statement." The court then rephrased the instruction: "Disregard the question as well as any answer that might have been given. Strike it from your mind. You are not to consider it for any purpose." Appellant then requested a mistrial, which was denied.

It is possible that the jury construed Wright's response as a comment on appellant's failure to testify. But in light of the evidence already before the jury, including appellant's statement to police in which he expressed his reasons for committing the offense, an equally plausible construction of Wright's response was that appellant's own statement to police was the best way of knowing what happened at the scene. Further, even assuming that Wright's response was an inadmissible and improper comment on appellant's failure to testify, the trial court cured any harm when it sustained the defense's objection and instructed the jury to disregard.[137] The remedial effect of the trial court's instruction was enhanced when the prosecutor withdrew the question and expressly disavowed any intent to comment on appellant's silence.[138] On the facts of this case, the trial court did not abuse its discretion by denying the motion for mistrial. Point of error nineteen is overruled.

---

[137] *See, e.g, Williams v. State,* 643 S.W.2d 136, 138 (Tex. Crim. App. 1982) (where prejudicial information is inadvertently placed before a jury through a witness's unresponsive answer, the general rule is that an instruction by the trial judge to the jury to disregard such answer is sufficient to cure harm); *Davis v. State,* 645 S.W.2d 817, 819 (Tex. Crim. App. 1983) (noting that a prosecutor's improper remark was not so prejudicial that it could not be cured by an admonishment to disregard, and further noting that the form and severity of the trial judge's admonishment to the prosecutor dramatized for the jury the importance of disregarding the statement).

[138] *See, e.g.*, *Hawkins v. State*, 135 S.W.3d 72, 84 (Tex. Crim. App. 2004) ("Although a prosecutor's self-corrective action might not carry the same weight as a trial court's instruction to disregard, it is nevertheless a relevant consideration in determining harm and can, in the appropriate circumstances, render an improper comment harmless.").

In point of error twenty, appellant asserts that the trial court erred in excluding Defense Exhibit 15, the *Lagrone* order, during the punishment phase of the trial. He "incorporates by reference the argument and authorities for Points of Error Numbers 10, 11[,] and 14." He also argues that the *Lagrone* order was competent evidence at the punishment phase because it was probative to rebut the false impression left by the State that, because of appellant's exercise of his Fifth Amendment rights, important information adverse to appellant could not be presented at trial. He reasons that, because the State had the burden to prove future dangerousness, the jury might have used knowledge of the *Lagrone* order to return a negative answer.

For the reasons set forth in point of error ten, above, this point of error is without merit. The *Lagrone* order was not itself evidence directly relevant to determining the future dangerousness or mitigation special issues. Further, the record does not support appellant's speculative arguments about favorable or unfavorable inferences that the jurors might have drawn. Point of error twenty is overruled.

In points of error twenty-one and twenty-two, appellant asserts that the trial court erred during the punishment phase by excluding evidence that appellant was not allowed to ask VA psychiatrist Dr. Carlo if, in his opinion: 1) appellant was suffering from PTSD; and 2) if appellant was as ill on the day of the offense as he was when he was admitted to the VA hospital, his illness would have affected his ability to act knowingly and intentionally at the time of the shooting. Appellant "incorporates by reference the argument and authorities to Point of Error Number 12."

Appellant argues that he should have been allowed to offer evidence to explain why "the federal government would not allow two key questions to be asked of Dr. Carlo." He claims that the jury would have expected the defense to ask those questions, but appellant had to rely on Dr. Saunders's testimony, which had been impeached when the State elicited Saunders's admissions that he was a paid defense expert and that he had not asked appellant, during his evaluation, what he had been thinking at the time of the offense.

However, for the reasons set forth in point of error twelve, above, this argument lacks merit. The mere fact that appellant was not able to ask certain questions of a witness was not itself evidence of any fact of consequence, and directing the jury to this fact would have invited the jury to speculate about evidence that was not before it.[139] Points of error twenty-one and twenty-two are overruled.

In point of error twenty-three, appellant asserts that the trial court erred in overruling his objection that the punishment charge failed to include "a special issue concerning severe mental illness" at the time of the offense, which, if found true by the jury, would have precluded imposition of the death penalty. Citing the Eighth Amendment, he asserts that "[t]his Court should hold that the death penalty for one who commits capital murder while severely mentally ill violates the prohibition [against] cruel and unusual punishment." He "incorporates by reference the argument and authorities for Point of Error Number 7."

The record shows that, at the charge conference, appellant objected as follows:

---

[139] *See, e.g., Wesbrook,* 29 S.W.3d at 115.

> The defense objects to the failure of the Court to instruct the jury on a special issue with regard to severe mental illness. We believe that there ought to be a special issue and instruction directing the jury to answer yes to a finding of severe mental illness that would result in a bar to the death penalty.

Appellant argued to the trial court that *Atkins* opened the door to finding that severe mental illness precludes imposition of the death penalty, predicting that "the Supreme Court inevitably will" rule that the severely mentally ill should not be subject to the death penalty.

Appellant acknowledged at trial that his requested jury charges were inconsistent with applicable state statutes. We have held that the instructions provided in the applicable statutes meet federal constitutional requirements by narrowing the class of death-eligible defendants.[140] The statutory provisions arguably provide more protections than those required by the federal constitution because they provide a jury a vehicle to fully consider mitigating evidence "in every conceivable manner in which the evidence might be relevant."[141] Appellant was free to urge the jury to give his mental illness determinative mitigating value, but he was not entitled to a jury instruction that it *must*. Unlike mental retardation or juvenile status, mental illness does not serve to categorically prohibit imposition of the death penalty. It is but one of many potential mitigating circumstances for the consideration of the finder of fact. Appellant's argument is without merit for the reasons set forth in point of error seven, above. Point of error twenty-three is overruled.

In point of error twenty-four, appellant asserts that the trial court erred in overruling

---

[140] *See Saldano v. State,* 232 S.W.3d 77, 107 (Tex. Crim. App. 2007).

[141] *Id.* (quoting *Cockrell v. State,* 933 S.W.2d 73, 92-93 (Tex. Crim. App. 1996)).

his objection to the punishment charge for failing to instruct the jury that the State had the opportunity to conduct its own mental health examination of appellant. Appellant "incorporates by reference the argument and authorities for Points of Error Numbers 11 and 21." He asserts that the inferences the jury could have drawn from such an instruction would have favored him with regard to both special issues. For the reasons set forth in points of error eleven, twenty, twenty-one, and twenty-two, above, this point is without merit. Point of error twenty-four is overruled.

In point of error twenty-five, appellant asserts that the trial court erred by overruling appellant's objection to the punishment charge for failing to include an instruction that appellant was not allowed to fully question Carlo before the jury. Appellant "incorporates by reference the argument and authorities in Points of Error Numbers 12, 22, and 23. [sic]"[142] For the reasons set forth in points of error twelve, twenty-one, and twenty-two, above, this point is without merit. Point of error twenty-five is overruled.

In point of error twenty-six, appellant asserts that the trial court erred by overruling his objection to the punishment charge for failing to instruct the jury that it cannot vote for the death penalty based on sympathy, passion, prejudice, public opinion, or public feeling. Appellant argues that the failure to give guidance to the jury harmed him, especially in light of the instruction that the jury should consider all evidence "militating" for or against the

---

[142] Because points of error twenty-one and twenty-two are briefed together, and point of error twenty-three does not concern the limitation on questioning, we infer that appellant means to incorporate his arguments and authorities from points of error numbers twelve, twenty-one, and twenty-two.

death penalty. Citing *Kansas v. Marsh,*[143] appellant asserts that it would have been proper for the jury to impose a life sentence based on sympathy or mercy. He asserts that the court's failure to instruct the jury as requested violated due process as guaranteed by the Fifth and Fourteenth Amendments and the Eighth Amendment's prohibition against cruel and unusual punishment.

Appellant's apparent complaint on appeal does not entirely coincide with his objections at trial. At trial, appellant first requested an anti-sympathy charge solely with respect to the decision to impose the death penalty, which was denied. Then, he stated that he had objected to the anti-sympathy charge that the trial court had been planning to give, but the offending instruction had been deleted, and his objection was no longer applicable. Then, he objected to the omission of an instruction expressly allowing mercy as a basis for a life sentence. Appellant's current argument appears to be that sympathy for the defendant, or mercy, is a proper consideration in deciding the special issues in favor of a life sentence, but sympathy for the victim is not a proper consideration in deciding the special issues in favor of a death sentence. His objections and jury charge requests at trial were less clear.[144]

Moreover, appellant's current argument is a misstatement of law. An instruction allowing the jury to be swayed by sympathy for the defendant but not the victim would deprive the State of the "full moral force" of its evidence. Evidence about the victim and the

---

[143] 548 U.S. 163, 176 (2006).

[144] *See* TEX. R. APP. 33.1; *see also, e.g., Saldano,* 232 S.W.3d at 83.

impact of the murder on the victim's family is a "humanizing factor essential for just decision-making;" the potential for such evidence to stir human feeling for the victim is part of what makes it relevant to the jury's decision as to whether or not the death penalty should be imposed.[145] This is especially true in a case such as this one where the defendant knew the victims.[146] In addition, such evidence is appropriate as rebuttal to the defendant's mitigating evidence.[147] An instruction to the jury effectively limiting the "full moral force" of this evidence would have been improper. Point of error twenty-six is overruled.

In point of error twenty-seven, appellant asserts that the trial court should have instructed the jury in the punishment charge that, if it failed to agree on a verdict, its failure to agree would be an acceptable result. Appellant asserts that the failure to so inform the jurors misled them into believing that they had to agree on the special issues or be forced to deliberate indefinitely, so that they might have felt compelled to abandon their views and vote for death. Appellant claims that the lack of such an instruction violated his right to due process guaranteed by the Fifth and Fourteenth Amendments and the Eighth Amendment prohibition against cruel and unusual punishment.

We have repeatedly rejected similar claims.[148] Appellant attempts to distinguish his

---

[145] *See Mosley,* 983 S.W.2d at 261 (citing *Payne,* 501 U.S. at 825, 827).

[146] *See id.* at 261 n.16.

[147] *Id.* at 262.

[148] *See Moore v. State,* 935 S.W.2d 124, 129 (Tex. Crim. App. 1996); *Davis v. State,* 782 S.W.2d 211, 221-22 (Tex. Crim. App. 1989).

requested instruction from an instruction informing jurors that their failure to agree will result in a life sentence, but appellant's requested instruction would have had the same effect of openly inviting the jury to avoid its statutory duty and disagree. Point of error twenty-seven is overruled.

In point of error twenty-eight, appellant asserts that the trial court improperly instructed the jury to "consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness," over his objection that the instruction forced the jury to disregard evidence of appellant's mental illness, remorse, good character, efforts to rehabilitate himself, and good deeds such as military service. Although appellant's stated point of error concerns a jury instruction, he focuses on the State's argument that the mitigating evidence offered by appellant did not reduce his moral blameworthiness.[149] He complains that the State argued for a very narrow meaning of "moral blameworthiness," so the trial court should have given a corrective instruction defining "moral blameworthiness" more broadly. He acknowledges that this Court has previously rejected similar claims but urges us to revisit the issue in light of the nature of appellant's mitigating evidence and the State's argument.

In closing argument, appellant presented a broader definition of "moral blameworthiness" when he argued to the jurors that, if they believed that his mental illness

---

[149] *Cf. Abdul-Kabir v. Quarterman,* 550 U.S. 233, 259 n.21 (2007) (prosecutorial argument as well as jury instructions can improperly preclude a jury from giving meaningful consideration to the relevant mitigating qualities of the defendant's proffered evidence).

or his good deeds sufficiently reduced his moral culpability, then they should answer the mitigating issue affirmatively:

> [Y]our duty is to give life unless they have proven to you beyond a reasonable doubt that he is a threat and if you have found there is nothing in his life, nothing in his service, nothing in his illness that reduced by even the grains of salt or the grains of sand his moral culpability or his blameworthiness.

Further, the trial court instructed the jury in accordance with the statutorily required language.[150] The arguments and instructions in this case did not force the jury to disregard appellant's mitigating evidence. Accordingly, point of error twenty-eight is overruled.

In point of error twenty-nine, appellant complains that the jury was instructed to consider all evidence that "militates" for the imposition of the death penalty, and the jury was not properly guided as to what is considered militating. Appellant "incorporates by reference the argument and authorities of Points of Error Numbers 2, 3, 5, 15, 16, 17, 18, 27[,] and 28." He reasons that the jury could have improperly considered victim-background, -character, and -impact evidence in deciding to vote for the death penalty, "without any real guidance and certainly not the guidance demanded by *Furman v. Georgia*."[151] We have previously rejected similar claims,[152] and appellant has not persuaded us to revisit the matter. Point of error twenty-nine is overruled.

In point of error thirty, appellant asserts that the trial court erred by overruling his

---

[150] *See Coble,* 330 S.W.3d at 296; *see also Russeau v. State,* 291 S.W.3d 426, 436 (Tex. Crim. App. 2009).

[151] 408 U.S. 238 (1972).

[152] *See Mays,* 318 S.W.3d at 397.

objection to the inclusion of the future dangerousness special issue, in that the issue was not pled in the indictment. Appellant acknowledges that we have rejected these and similar claims, but he urges us to reconsider.[153] We decline to do so. Point of error thirty is overruled.

In points of error thirty-one, thirty-two, and thirty-three, appellant asserts that the trial court erred by overruling his objections to the punishment charge because it did not include definitions of "probability," "criminal acts of violence," and "continuing threat to society." He acknowledges that we have rejected similar claims.[154] We decline to reconsider our previous decisions. Points of error thirty-one, thirty-two, and thirty-three are overruled.

In point of error thirty-four, appellant asserts that the trial court erred in overruling his objection to the charge for failing to include any guidance as to how to consider the victim-impact and victim-character testimony. Appellant "incorporates by reference the argument and authorities to Point of Error Number 29." He asserts that the victim-character and victim-impact evidence in this case appealed to raw emotion and engendered sympathy for the victims and their families, and without any guidance on how to consider such evidence, the jury would have been likely to impose the death penalty in an arbitrary manner. He acknowledges that we have rejected similar claims.[155] He argues, however, that in this case, a substantial amount of evidence was admitted for limited purposes unrelated to the special

---

[153] *See Luna,* 268 S.W.3d at 608-09.

[154] *See id.*

[155] *See Mays,* 318 S.W.3d at 391.

issues, and so a limiting instruction should have been provided.

As explained in point of error twenty-nine, above, the evidence that appellant describes as "admitted for limited purposes" was relevant to the jury's determination of the special issues and was properly considered for all purposes. We decline to revisit our previous decisions. Point of error thirty-four is overruled.

In point of error thirty-five, appellant asserts that the trial court erred in overruling his objection to the punishment charge for failing to place a burden of proof on the State with regard to the mitigation special issue. He acknowledges that we have previously rejected similar claims. He argues, however, that considering "the substantial amount of mitigating evidence and the substantial amount of background and victim-related evidence that might improperly be considered militating by the jury, due process and the protection against cruel and unusual punishment" dictate that such an instruction should have been given in this case. We are not persuaded to reconsider our previous decisions.[156] Point of error thirty-five is overruled.

In point of error thirty-six, appellant asserts that the trial court erred in overruling his objection to the punishment charge for failing to instruct the jury that mercy itself may warrant a life sentence instead of the death penalty. Appellant asserts that the Supreme Court has "cited with approval" the mercy instruction set forth in the Kansas punishment scheme.[157]

---

[156] *See Blue v. State,* 125 S.W.3d 491, 501 (Tex. Crim. App. 2003).

[157] *See Kansas v. Marsh,* 548 U.S. 163, 176 (2006) (quoting and discussing KAN. STAT.
(continued...)

Despite significant differences between the Kansas and Texas punishment schemes, appellant then concludes that the Texas punishment scheme is unconstitutional because it does not include a mercy instruction. However, the Supreme Court in *Marsh* did not say that a mercy instruction is constitutionally required.[158] The instructions mandated in Article 37.071 distinctly set forth the law applicable to the case and provide the jury with adequate means to consider any relevant mitigating qualities of the proffered evidence and express a reasoned moral response to a defendant's plea for mercy.

Appellant argues that "[a]n instruction not to impose the death penalty based on sympathy, passion, prejudice, public opinion or public feeling is a proper statement of the law."[159] For this proposition, he cites to *Tong v. State*, in which we endorsed a jury instruction that informs the jury that it could not be influenced by sympathy in answering the statutory special issues because "evidence that relies on mere sympathy or emotional response is irrelevant to the jury's consideration of the deathworthiness of the defendant."[160] Such an anti-sympathy instruction is appropriate because it is neutral with respect to which side might stand to benefit from it. What appellant would effectively have us now endorse,

---

[157](...continued)
ANN. § 21-4624(c)).

[158] *See id.; cf. Abdul-Kabir,* 550 U.S. at 259 (Constitution mandates that a jury must have a meaningful basis to consider the relevant mitigating qualities of the defendant's proffered evidence).

[159] Appellant's Brief at 89.

[160] *Tong v. State*, 25 S.W.3d 707, 710 (Tex. Crim. App. 2000).

however, would be a unilateral anti-sympathy instruction, authorizing the jury to consider sympathy for himself in deciding whether to impose a life sentence, but failing to authorize the jury to consider the victims of his offense in deciding whether he might be more deserving of the death penalty. For reasons we have already explained in rejecting appellant's twenty-sixth point of error, we likewise overrule his thirty-sixth point of error.

In point of error thirty-seven, appellant asserts that the trial court erred in overruling his objection to the jury charge for failing to instruct the jury that one juror's "No" vote to the future dangerousness special issue, or a "Yes" vote to the mitigation special issue, is sufficient to cause a life sentence to be imposed rather than the death penalty. In point of error thirty-eight, he asserts that the trial court erred in overruling appellant's objection to the jury charge based on its failure to instruct the jury that no mistrial would result if jurors failed to reach an agreement on either of the two special issues, and its potential for misleading the jury. We have previously rejected similar claims, and we are not persuaded to revisit the matter.[161] Points of error thirty-seven and thirty-eight are overruled.

In point of error thirty-nine, appellant asserts that the trial court erred in overruling his objection to the punishment charge for failing to instruct the jury that it could not consider evidence of extraneous offenses unless it believed beyond a reasonable doubt that appellant had committed such offenses. Appellant acknowledges that we have previously rejected similar claims on the basis that an instruction on the burden of proof is not necessary

---

[161] *See Williams,* 301 S.W.3d at 694.

because the future dangerousness instruction includes the "beyond a reasonable doubt" language. Appellant argues that this reasoning is flawed because extraneous offense evidence is considered in determining the mitigation special issue, which contains no language with respect to a burden of proof. However, we are not persuaded to revisit the matter.[162] Point of error thirty-nine is overruled.

In point of error forty, appellant asserts that the trial court erred in overruling his objection to the charge for failing to instruct the jury that a minority or dissenting juror has the right to communicate to the court that the juror's mind has been made up and will not change. For the reasons stated in point of error twenty-seven, above, this point is without merit. Point of error forty is overruled.

In point of error forty-one, appellant asserts that the trial court erred in overruling his objection to the charge for failing to give the jury a mechanism to give effect to sudden passion arising from an adequate cause to reduce the punishment as in a murder case. We have held that the jury instructions set forth in Article 37.071 meet federal constitutional requirements by narrowing the class of death-eligible defendants, and they arguably provide more protections than those required by the federal constitution because they provide a jury with a vehicle to fully consider mitigating evidence "in every conceivable manner in which

---

[162] *See Hunter v. State,* 243 S.W.3d 664, 674 (Tex. Crim. App. 2007); *Ladd v. State,* 3 S.W.3d 547, 574-75 (Tex. Crim. App. 1999).

the evidence might be relevant."[163] We have also held that "[t]here is no free-floating, non-statutory, common-law right to an instruction on sudden passion and provocation in a capital murder trial."[164] As with appellant's mental illness, he was free to argue to the jury that it should give his sudden passion mitigating value. But he was not entitled to a jury instruction to that effect. Point of error forty-one is overruled.

In point of error forty-two, appellant asserts that the trial court erred when it overruled his objection to the charge for failing to include an instruction that the jury will not be required to deliberate indefinitely. For the reasons stated in point of error twenty-seven, above, this point is without merit. Point of error forty-two is overruled.

In point of error forty-three, appellant asserts that the trial court erred when it overruled his objection to the charge for failing to instruct the jury that its failure to reach an agreement would result in a punishment no more lenient than life in prison. For the reasons stated in points of error thirty-seven and thirty-eight, above, this point is without merit. Point of error forty-three is overruled.

In point of error forty-four, appellant asserts that the trial court erred in denying his request for a mistrial when the State commented on appellant's failure to testify at the punishment phase. He asserts that the prosecutor improperly commented on his right to remain silent when, in the course of arguing that jurors should not show appellant any more

---

[163] *See Saldano,* 232 S.W.3d at 107 (quoting *Cockrell,* 933 S.W.2d at 92-93).

[164] *Mays*, 318 S.W.3d at 388.

mercy than he had shown his victims, he stated: "He tells you 'spare my life because I have a future' when he ripped futures away."

Defense counsel objected that this statement was a comment on appellant's failure to testify and was improper argument. The trial court instructed the parties to approach the bench. Defense counsel argued that the prosecutor's statement identified the defendant as the speaker and put words in his mouth. The prosecutor responded that he was not talking about whether the defendant testified but about the defense's strategy. The trial court sustained the objection "[j]ust to be safe," and instructed the jury to disregard the prosecutor's last statement, but denied appellant's motion for a mistrial.

As discussed in point of error nineteen, above, in assessing whether the defendant's Fifth Amendment right has been violated, courts must view the State's argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible argument.[165] If the record shows that some other explanation for the prosecutor's remark is equally plausible, we will not find that the prosecutor manifestly intended to comment on the defendant's failure to testify.[166] Further, a trial judge's instructions to disregard are generally considered sufficient to cure an impropriety in jury argument, and a trial judge's denial of a motion for mistrial must be upheld if the ruling was within the zone

---

[165] *Randolph,* 353 S.W.3d at 891.

[166] *See id.*; *Cruz,* 225 S.W.3d at 548.

of reasonable disagreement.[167]

By this time in the proceedings, appellant had presented numerous witnesses who testified about his good character and good deeds throughout his life, good conduct and Bible studies while in jail, and potential for doing good works even while in prison. The prosecutor's argument to the effect that the defendant was asking jurors to spare his life for the sake of his future, when he had deprived his victims of their futures, could plausibly be interpreted as a reference to appellant's case in mitigation. Therefore, we will not find that the prosecutor manifestly intended to comment on the defendant's failure to testify. The trial court's instruction to disregard cured any error, and the court did not abuse its discretion by denying the motion for mistrial. Point of error forty-four is overruled.

In point of error forty-five, appellant asserts that the trial court erred in denying his request that he be sentenced to life in prison when the jury failed to reach an agreement after deliberating for eight and one-half hours. He observes that, after deliberating for over eight hours, the jury was sequestered on the Thursday night before a holiday weekend, and the next morning they reached a unanimous verdict. He complains that "[i]n light of the record of this case and the fact that a holiday weekend was beginning, it is apparent that the risk of coercion through sequestration was high." He states that denying his motion to discharge the jury and sentence him to life in prison violated his right to due process under the Fifth and Fourteenth Amendments and the Eighth Amendment's prohibition against cruel and unusual

---

[167] *See Gardner,* 730 S.W.2d at 696; *see also Coble,* 330 S.W.3d at 292.

punishment.

The record reflects that the jury began deliberating at 11:55 a.m. on Thursday, May 27, 2010. At 2:22 p.m., the jury sent out a note asking for a definition of "society." With the agreement of the parties, the court sent the jurors a response at about 3:04 p.m., telling them to continue deliberating. At 8:30 p.m., defense counsel requested that the court sentence the defendant to life because the jury had been deliberating eight and one-half hours but had not reached a verdict. The trial court made a record that the jury had not sent out any note to the effect that the jurors were unable to agree and denied the request. At 8:35 p.m., the trial court ordered that the jurors would be sequestered and that they would return to the courthouse at 8:30 a.m. the following morning. At 10:24 a.m. on Friday, May 28, 2010, the trial court was informed that the jury had reached a verdict, and at 10:25 a.m., the jurors were brought out, and the foreman of the jury read the verdict. The jurors were polled, and each juror confirmed that the verdict was his or hers.

Appellant cites no legal authority for his position that the trial court abused its discretion by refusing to dismiss a deliberating jury that had never communicated an inability to reach an agreement. Nor has he cited any authority for his position that being sequestered on the Thursday night before a holiday weekend constitutes coercion. Appellant seems to argue both that the jury deliberated for too long (as shown by its inability to reach a decision before it was sequestered on Thursday night) and that the jury did not deliberate long enough (as shown by the fact that it reached a decision on Friday morning). There is no set time limit

for jury deliberation.[168]  We reject appellant's implication that the jurors would take their deliberative responsibility so seriously that they deliberated all day Thursday, and yet so lightly that they reached a verdict on Friday for the sake of keeping their weekend plans.

In this case, both parties presented extensive punishment evidence, including numerous State's witnesses who testified about appellant's bad conduct in his previous relationships and numerous defense witnesses who testified about appellant's hardships as well as his good works and redeeming qualities.  We conclude that the trial court did not abuse its discretion by declining to discharge the jury and enter a sentence of life in prison after the jury had been deliberating for a little over eight hours and had never communicated an inability to reach an agreement.[169]  Point of error forty-five is overruled.

We affirm the judgment of the trial court.


DELIVERED:      February 26, 2014
DO NOT PUBLISH

---

[168]  *Green v. State,* 840 S.W.2d 394, 407 (Tex. Crim. App. 1992).

[169]  *See Howard v. State,* 941 S.W.2d 102, 121 (Tex. Crim. App. 1996) (when reviewing the trial court's discretion, this Court will consider the sheer length of the trial and the amount of evidence presented to the jury).